**Bruce WILSON d/b/a The Rink II, Appellant,**

v.

**The CITY OF NORTH LITTLE ROCK, William Younts (Individually and in his official capacity), Ken Cross (Individually and in his official capacity), Jimmy Green (Individually and in his official capacity), Eddie Hightower (Individually and in his official capacity), Bill Cotton (Individually and in his official capacity), Gene Barrentine (Individually and in his official capacity), Donnie Smith (Individually and in his official capacity), Jim Tanner (Individually and in his official capacity), Robert McClain (Individually and in his official capacity), Bobby Foiles (Individually and in his official capacity) and David Burns (Individually and in his official capacity), Appellees.**

No. 85–2060.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1986.

Decided Sept. 12, 1986.

James W. Cherry, Little Rock, Ark., for appellant.

Terry Ballard, North Little Rock, Ark., for appellees.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and HANSON,* Senior District Judge.

LAY, Chief Judge.

Bruce Wilson, the owner of a roller skating rink (Rink II) in North Little Rock, Arkansas (City) brought this action against the City and eleven City police personnel in their individual and official capacities. Wilson alleged that the operation of a police roadblock erected just outside Rink II following a "soul night" at the rink interfered with his constitutional rights in violation of 42 U.S.C. § 1983 and tortiously interfered with his prospective business relationships, in violation of state law. The district court [1] directed verdicts in favor of all defendants on Wilson's § 1983 claim and in favor of some defendants on the state tort claim. The jury subsequently found in favor of the remaining defendants on the state tort cause of action. Wilson appeals, challenging the directed verdicts only as to the § 1983 claim.

Every Wednesday night since 1979, Wilson has promoted "soul night" at his skating rink in an effort to attract black customers. Apparently the promotion was quite successful. Soul night consistently attracted a large crowd of skaters, virtually all of whom were black. The success of soul night allegedly contributed to complaints by the residents in the area. The rink closed at midnight, and some 150 to 200 cars left the rink at closing time, resulting in a sudden, heavy traffic flow and some littering and noise. Wilson and others testified, though, that the rink staff patrolled for litter in the neighborhood after closing time and that persons patronizing the rink on Wednesday nights were exceptionally well behaved. With the exception of one incident involving a minor traffic infraction, Wilson was unaware of any complaints about the behavior of the Wednesday night crowd.

Wilson had received complaints of another character, however, from City police personnel before the roadblock incident. Wilson testified that certain police officers had long threatened adverse treatment against him for promoting soul night. Specifically, Wilson testified that Sergeant Cross asked him why he was "skating all those niggers" and told Wilson that "we don't want them in the area." Another police officer, Lieutenant Cotton, told Wilson in early summer of 1982 that "we don't want them in that area" and called Wilson a "nigger lover." One week before the roadblock in a conversation outside Rink II, Sergeant Woody Juel asked Wilson why he continued "to skate all these niggers." When Wilson responded that soul night was a substantial share of his business, Juel responded that he had "been told by the City to tell you to stop."

On the night of the roadblock, Lieutenant Hightower was substituting as shift commander for Lieutenant Cotton, who was on vacation. Captain Barrentine, the officer in charge of the patrol division, had earlier directed Hightower to put some ad-

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

ditional patrol cars near Rink II, apparently to remedy the problems that had been reported in the area. Barrentine testified that the complaint about the rink had come through either the Chief or Assistant Chief's office.

Hightower relayed Barrentine's instructions to Sergeant Cross at the beginning of Cross' 11 p.m. shift. Cross told Hightower that he and Lieutenant Cotton had previously agreed that Cross would implement a "vehicle safety check" near the rink when personnel became available. At trial, Cross testified that in his conversation with Hightower, Cross did not specify what he meant by a "vehicle safety check." At approximately 11:30 p.m., Cross telephoned Hightower from the rink area to inform the lieutenant that Cross had observed several vehicles operated by apparently underage drivers. He also reported some reckless driving, loud mufflers, and other defects in vehicles in the area. Cross again told Hightower that he would institute a "vehicle safety check."

A detail of patrolmen, commanded by Sergeant Cross, then set up a roadblock on the one route out of Wilson's rink. The police structured the roadblock so that all cars leaving the rink had to pass through the roadblock. While the cars with black passengers were stopped, at least one car with white passengers was waved through. The officers asked the drivers of stopped cars to produce drivers licenses and registrations and asked some drivers to operate their cars' headlights. Of the 60 to 80 drivers stopped, 11 were ticketed, and all 11 were black. Police officers were overheard calling young black men "boys," and several witnesses testified that they perceived the roadblock as an intentional effort by the police department to harass blacks.

At the scene of the roadblock, an officer told one of Wilson's employees that orders for the roadblock had come "from the corner office." The officer later explained this comment to mean "either the chief's office or the shift commander's office or something." Hightower was asked in deposition who had prior knowledge of the "problem" in the area:

Q. As far as you know, Captain Barrentine, yourself, Lieutenant Cotton, and Sergeant Cross were the people who knew about the problem and knew that Cross was headed out that night to try to do something about it?

A. And you could probably include Chief Younts.

Q. Okay.

A. Because, like I said, at that time, there's very little done, period, that he didn't direct.

Q. Didn't know something about?

A. Yeah. And I'm sure he was aware of the situation, because at that time, the Captain cleared everything with him before he did this and that. And I'm sure that he was aware that some action was going to be taken.

Wilson complained to the police department about the roadblock. His Wednesday night business had slowed substantially following the incident, to the point that Rink II was closed on Wednesday nights at the time of trial. Cotton, Cross, and Barrentine held a meeting to discuss Cross' actions. The meeting produced a "personnel conference memo" in which Barrentine commented that

Sgt. Cross was advised that the decision to conduct such a roadblock [was] wrong, and it's my opinion that the roadblock was not justified. Sgt. Cross was advised that the roadblock was not necessary to reduce the type of complaints that [were] coming from that area of the City. I feel that this improvement conference is all that is necessary at this time. I recommend no disciplinary action.

On Captain Barrentine's recommendation, the police department took no disciplinary action against Cross. Police procedures allowed Cross to respond to the alleged misconduct. In his response, Cross claimed that the purpose of the roadblock was "to identify and correct vehicle defects, current vehicle licenses, drivers licenses, and check active warrants on persons suspected of

being wanted." He also explained that Lieutenant Hightower had authorized the "vehicle check."

Wilson then brought this action against the City and eleven individual police officers, naming as defendants Bill Younts, the Chief of Police, Jimmy Green, the Assistant Chief, Gene Barrentine, the patrol division commander, Eddie Hightower, the substitute shift commander, Bill Cotton, the regular shift commander, Ken Cross, the patrol commander, and five officers on duty at the roadblock. Wilson sought damages allegedly incurred as a result of the roadblock and an injunction prohibiting future use of any similar tactic. He claimed that the roadblock violated his rights to due process and equal protection of the laws and that he therefore had a cause of action against the defendants under § 1983. Wilson also alleged a state tort claim for interference with the prospective business relationship between his business and each of his soul night customers.

This case was tried before a jury. At the close of Wilson's evidence, the district court granted the City's motion for a directed verdict, as well as motions for directed verdicts in favor of Younts, Green, and Barrentine. The court first examined the bases of Wilson's claim against Younts, questioning the sufficiency of the evidence against Younts. Wilson relied heavily on Younts' status as chief of police to support his claim against the chief. Wilson also claimed that Barrentine had received orders from either Younts or Green to handle the situation at the rink, that little happened in the police department that Younts did not control, and that one of the officers at the scene of the roadblock stated that orders for the roadblock "came from the corner office." With respect to Green and Barrentine, Wilson relied primarily on their positions in the chain of command, with Barrentine as the patrol commander who had passed on the orders to deal with the situation at the rink and Green as Assistant Chief. The district court determined that the evidence was insufficient as a matter of law and directed verdicts in favor of Younts, Green, and Barrentine.

The court then analyzed the evidence relevant to the City's liability. The court scrutinized Wilson's evidence of the existence of a police policy that violated his constitutional rights. Referring first to the police department's policy manual, the court noted the general provisions in the rules requiring police officers to conduct themselves at all times in conformity with the law and in a courteous fashion. "Conduct unbecoming an officer" is prohibited, and officers are ordered not to "speak lightly or slightingly of the * * * color * * of any person." No written policy respecting the use of roadblocks was included in the manual, and there was evidence that this was the only roadblock of this type that the police department had ever instituted. Further, the court observed that there was a lack of evidence "that anybody upstream of Officers Cotton and Hightower had any knowledge or * * * policy, to inflict harm upon the plaintiff by harming his business before this particular event occurred." Concluding that "no persistent pattern of constitutionally offensive acts by either Lt. Cotton or Lt. Hightower or any of the subordinates" existed, the court granted the City's motion for directed verdict.

Following submission of the remaining evidence, the district court, relying on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), granted directed verdicts in favor of the remaining individual police officers with respect to the § 1983 claim. The case was then submitted to the jury solely on the issue of the individual defendants' liability for the state cause of action. The jury returned a verdict in favor of each of the defendants.

In its review of a grant of directed verdict, this court "do[es] not engage in the usual presumption in favor of the correctness of the ruling by the lower court." *Koch Security v. Secretary of the Department of HEW*, 590 F.2d 260, 261 (8th Cir. 1978). The motion should be granted only if "all the evidence points one way and is susceptible of no reasonable inferences sus-

taining the position of the nonmoving party." *Dace v. ACF Industries, Inc.,* 722 F.2d 374, 375 (8th Cir.1983) (quoting *Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co.,* 523 F.2d 833, 836 (8th Cir. 1975)), *adhered to as supplemented,* 728 F.2d 976 (8th Cir.1984); *see also Simpson v. Skelly Oil Co.,* 371 F.2d 563 (8th Cir. 1967) (essential question is whether nonmovant has produced substantial evidence to warrant a favorable verdict).

## I. Liability of individual officers

We first address whether the district court properly directed verdicts in favor of each of the defendants in their individual capacities. Since it is well settled that the doctrine of respondeat superior has no application in a § 1983 action to shift the responsibility for the plaintiff's injuries, *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir.1984), we must analyze separately the potential liability of each officer. To minimize repetitive analysis, we first consider the claims against the officers who were present at the roadblock.

 In directing verdicts in favor of the police personnel who actually implemented the roadblock, the district court relied on *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In *Parratt,* the plaintiff's procedural due process claim against lower ranking prison officials was dismissed because there existed an adequate state post-deprivation remedy sufficient to compensate the plaintiff for his injury. *Id.* at 540–41, 101 S.Ct. at 1915–16.

When it concluded that the *Parratt* reasoning applied with respect to the individual officers involved, the district court did not have the benefit of two recent Supreme Court cases, *Davidson v. Cannon,* — U.S. ——, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and *Daniels v. Williams,* — U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), or of our recent decision in *New v. City of Minneapolis,* 792 F.2d 724 (8th Cir.1986). In *New,* we explained that:

> [T]he Supreme Court in *Daniels* and *Davidson* did not change the rule that intentional abuse of official power, which shocks the conscience or which infringes a specific constitutional guarantee * * * implicates the substantive component of the due process clause regardless of the availability of state remedies.
>
> \* \* \* \* \* \*
>
> [C]laims of this nature involving substantive due process are to be considered without regard to whether adequate state tort remedies provide an alternate form of redress.

*Id.* at 725–26 (citations omitted). *Accord Daniels v. Williams,* — U.S. ——, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in judgments). Unlike the situation in *Parratt,* there is no allegation in this case that the officers' conduct supports a claim based upon a deprivation of procedural due process. Rather, Wilson's complaint is in the nature of a substantive due process challenge: he claims that he was deprived of his property by means motivated by racial animus, implicating the equal protection clause of the fourteenth amendment.[2] Therefore, the district

---

2. There is no question that Wilson has standing to assert a claim bottomed on alleged racial discrimination suffered by his black clientele. As the Supreme Court stated in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976):

> [V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.

*Id.* at 195, 97 S.Ct. at 456 (citing *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d

349 (1972); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)); *see also Fiedler v. Marumsco Christian School,* 631 F.2d 1144, 1150 (4th Cir.1980) (white plaintiffs had standing under § 1981 to sue for expulsion from school based on association with black student); *Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235, 1244–45 (3d Cir. 1978) (white male had standing under § 1985(3) to challenge termination allegedly because he supported equal opportunity for women); *Park*

**322**

court erred when it dismissed Wilson's § 1983 claim against these police officers on the rationale of *Parratt*. Further, since the question of these officers' motivation is one of fact potentially within the province of a jury, we do not speculate whether the evidence might support a verdict in Wilson's favor on these claims. We remand to the district court the issue of these officers' liability under § 1983.

The district court also dismissed Wilson's § 1983 claim against each of the supervisory officers superior in the chain of command to Sergeant Cross and the officers at the scene of the roadblock.

In *Harris v. Pirch*, 677 F.2d 681 (8th Cir.1982), we summarized the general rules applicable in § 1983 claims against supervisory police personnel:

A § 1983 action against police supervisory officers cannot be based upon the theory of respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Moreover, it appears that the Supreme Court has held that a § 1983 action will not lie against police supervisory officers for failure to prevent police misconduct, absent a showing of direct responsibility for the improper action. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977). What is required is a causal connection between the misconduct complained of and the official sued. *See McClelland v. Facteau*, 610 F.2d 693 (10th Cir.1979). "Liability may be found only if there is personal involvement of the officer being sued." *Watson v. In-*

*terstate Fire & Casualty Co.*, 611 F.2d 120, 123 (5th Cir.1980).
*Id.* at 685.

In the present case Wilson argues that Chief Younts may be held liable for the roadblock because the evidence supports the inference that he either personally ordered the roadblock or knew or should have known that Cross would take such an action and failed to prevent it. The latter theory is based on the notion that Younts breached a duty to supervise or control his subordinates. A cause of action predicated on such a theory may be maintained only if Younts demonstrated deliberate indifference or tacit authorization of the offensive acts by failing to take remedial steps following notice of a pattern of such acts by his subordinates.[3] *See Marchant v. City of Little Rock*, 741 F.2d 201, 204–05 (8th Cir.1984) (isolated instances of misconduct by subordinates do not give rise to supervisory liability where supervisor had no knowledge of or connection with improper acts); *Miller v. Solem*, 728 F.2d 1020, 1024–25 (8th Cir.) (failure of proof that prison officials recklessly disregarded plaintiff's Eighth Amendment rights), *cert. denied*, 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984); *Cotton v. Hutto*, 577 F.2d 453 (8th Cir.1978) (no claim for damages stated against commissioner of state corrections department under § 1983 where commissioner had no knowledge of or connection with challenged disciplinary action).

The strongest evidence tending to show that Younts had notice of a pattern of unconstitutional acts by the officers on duty is the testimony that several officers had threatened Wilson because of his practice of soliciting black business. These

---

*View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1212–14 (8th Cir.1972) (organization with economic interest in integrated housing project had standing to challenge allegedly discriminatory zoning ordinance).

**3.** Thus, insofar as Wilson relies on a theory of liability based on simple negligence, his argument cannot stand. An officer's negligent conduct cannot support a § 1983 claim, whether the claim is premised on a violation of due process, *see Davidson v. Cannon*, —— U.S. ——,

106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence does not give rise to a § 1983 claim based on a violation of due process), or on a violation of the equal protection clause, *see Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (invidious discriminatory purpose required for claim of racial discrimination under the equal protection clause).

comments included statements allegedly made by Sergeant Cross, Lieutenant Cotton, and Sergeant Juel which we will not dignify with repetition here. As deplorable as this conduct was, we find no evidence that Chief Younts knew of these purported statements, nor do we believe it a fair inference that Chief Younts was aware of them because they were allegedly made and repeated over a period of time. The record contains three somewhat ambiguous statements by Younts' subordinates that the Chief or his assistant Green knew of the alleged problems and of the planned action at Rink II simply because "there was very little done * * * that [Younts] didn't direct." To conclude from these general observations that Younts or Green somehow had reason to believe that officers would take action against Wilson and thus tacitly authorized the installation of the roadblock for improper reasons by failing to take remedial steps to prevent the officers' conduct stretches the inference beyond reason.

There is also no showing that Younts or Green affirmatively ordered a roadblock to harass Wilson's black clientele. Although there is evidence in the record that Younts was aware of citizen complaints about traffic problems in the area of the rink after soul night and that he ordered that something be done about the problem, there is no evidence that Younts or Green directed that the problem be handled by a roadblock or that the Chief was motivated by improper reasons in ordering that something be done. The record indicates that this was the only roadblock of this kind ever implemented by the North Little Rock Police Department and that there were no written policies pertinent to situations warranting such a tactic. The usual procedure for handling complaints of this nature was to stop individual cars based on a particular suspicion that the car's driver was violating traffic laws. The testimony of Officers Hightower and Barrentine further indicates that none of the senior officers inferred from Chief Younts' directions that any extraordinary procedures should or would be employed at the rink that night.

We therefore conclude that the district court properly granted a directed verdict in favor of Chief Younts and Assistant Chief Green on Wilson's § 1983 claim.

■■■■ Lieutenant Cotton was shift commander and normally would have been in charge of the patrol on the evening of August 4. However, Lieutenant Hightower was substituting that evening because Cotton was on vacation. We find no evidence that Cotton participated in any way in the purportedly illegal roadblock, and the district court properly dismissed Wilson's § 1983 claim against him. Hightower, on the other hand, was in charge that evening. He received an order from Captain Barrentine to look into the complaints and put more cars on and to "take care of the matter." Barrentine stated that he did not authorize the roadblock and did not know the nature of the officers' activities that night until several days later. There is no direct evidence that Barrentine ordered Hightower to conduct a roadblock or otherwise systematically stop every car. At most, Barrentine acted as a conduit for Younts' general orders, and the district court properly dismissed Wilson's § 1983 claim against him.

Lieutenant Hightower also claims that he did not authorize the roadblock and that in their conversations on August 4, Sergeant Cross did not specify that he intended to set up a roadblock and stop every car leaving Rink II that night. Sergeant Cross stated in his deposition that Hightower knew that "vehicle safety check" meant roadblock and that the lieutenant had authorized Cross to implement one outside Rink II. Captain Barrentine also testified that Cross told him that Hightower had authorized the roadblock. Barrentine's interoffice memorandum of August 23, 1982, following the meeting with Cotton and Cross, verifies this testimony. There is also evidence that the decision to conduct a roadblock was left to the discretion of the field supervisor. In any event, Hightower's disagreement with Cross as to what Hightower knew or approved and the ques-

**324**

tion of who had the power to authorize a roadblock are issues of fact for the jury.

■ What is clear from the record is that Lieutenant Hightower was the highest ranking officer on duty on the night shift on August 4. The authority to act was vested in him and delegated by him to Sergeant Cross. Thus the discretion to take action that night outside Rink II can be traced from Cross to Hightower. Under the circumstances, it was error for the district court to dismiss Hightower under the court's application of *Parratt.*

## II. Liability of the City of North Little Rock

■ Our conclusion that Chief Younts may not be held liable in his individual capacity for the installation of the roadblock leads to the conclusion *a fortiori* that the City may not be held liable for the incident either. The predicate for municipal liability under § 1983 and *Monell* is that the alleged constitutional violation be conducted pursuant to an unconstitutional city policy. *Pembaur v. City of Cincinnati,* — U.S. —, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Wilson does not contend that the City had any express policies, aside from those established by Chief Younts, relevant to the installation of the roadblock. Since we believe that the evidence is insufficient to find that Younts participated in any unconstitutional behavior, we are compelled to conclude further that his conduct did not amount to an instance of unconstitutional city policy. There is also no allegation that anyone

other than Chief Younts was a municipal policymaker with respect to such matters or that the Chief had delegated his authority to a lower ranking official. *See Pembaur,* 106 S.Ct. at 1298–1300.[4] While the evidence corroborates common knowledge that every police officer has discretion to act in accord with the given circumstances, it is insufficient to establish a municipal policy of illegal conduct amounting to an abuse of power. We therefore hold that the district court properly granted a directed verdict in favor of the City.

The district court's decision is affirmed in part and reversed in part and remanded for further proceedings on the liability of the remaining individual defendants.

---

**4.** Although only four justices joined in Part II(B) of *Pembaur,* Justice O'Connor's concurring opinion does not disagree with the following observation by Justice Brennan in II(B):

Having said this much, we hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise

of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *See, e.g., Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

106 S.Ct. at 1299–1300 (footnotes omitted); *see also Praprotnik v. City of St. Louis,* 798 F.2d 1168, 1173 (8th Cir.1986); *Small v. City of Belfast,* 796 F.2d 544 (1st Cir.1986).