849 F.2d 1117
 Wanda Charlene BOSWELL, individually and as personal
representative of the Estate of Joseph Boswell, Appellee,
v.
The COUNTY OF SHERBURNE, Richard Witschen, Sheriff of
Sherburne County, individually and in his official capacity;
John Doe Daniels, Chief Jailer, Sherburne County Jail,
individually and in his official capacity; Valerie Lero,
Jailer, Sherburne County Jail, individually and in her
official capacity; Nancy Riecken, Jailer, Sherburne County
Jail, individually and in her official capacity, Appellants,
Donny Dorf, Jailer, Sherburne County Jail, individually and
in his official capacity; City of Elk River, Elk
River Fire & Ambulance Service, Steven
Dittbenner, Ralph Barsody, John Follmer.
 No. 87-5187.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1987.
Decided June 21, 1988.
Rehearing and Rehearing En Banc Denied Aug. 11, 1988.
 
 Joseph Marshall, Circle Pines, Minn., for appellants.
 Marc Slonim, Seattle, Wash., for appellee.
 Before LAY, Chief Judge, HEANEY and MAGILL, Circuit Judges.
 MAGILL, Circuit Judge.
 
 
 1
 I. INTRODUCTION.
 
 
 2
 Richard Witschen, Sheriff of Sherburne County, Minnesota; Steven Daniels,* chief jailer, Sherburne County Jail; Valerie Lero, jailer, and Nancy Riecken, jailer, (collectively, appellants) together appeal from a district court[1] order denying their motion for summary judgment. The district court disagreed with appellants' assertion that they are entitled to qualified immunity for any violation of Wanda Charlene Boswell's (Boswell) constitutional rights while she was a pretrial detainee in the Sherburne County Jail. Because we agree with the district court, we affirm.II. FACTS.
 
 
 3
 The district court's denial of summary judgment comes to us as an appealable interlocutory decision because appellants' motion was based on the defense of qualified immunity. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Mitchell instructs that we need "not consider the correctness of plaintiff's version of the facts," when reviewing a denial of summary judgment. Id. at 528, 105 S.Ct. at 2816. Therefore, as we illuminate the facts of this case, we do so in the light most favorable to Boswell. Myers v. Morris, 810 F.2d 1437, 1459 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).
 
 
 4
 Shortly after midnight on March 24, 1984, Boswell was arrested for operating a vehicle under the influence of alcohol. She was taken to the Sherburne County Jail in Elk River, Minnesota, to be held on that charge and on warrants for her arrest issued by two other Minnesota counties. While booking Boswell, jailer Valerie Lero learned that Boswell was six and one-half months pregnant and was having a problem pregnancy. Boswell related to Lero that she had had abnormal vaginal discharge, and had fainted three days earlier. She also stated that she was under the care of a physician, and gave her doctor's phone number to Lero. While showering, Boswell discovered that she was bleeding. She immediately informed Lero. Lero gave Boswell sanitary pads before locking her into a cell for the night, but made no attempt to contact Boswell's physician or any other trained medical personnel. Lero failed to record Boswell's bleeding in her log, and neglected to communicate any of the information she had concerning Boswell's medical condition to the next jailer, Nancy Riecken, who relieved Lero at 6:00 a.m.
 
 
 5
 About 7:00 a.m., Riecken was called by Boswell. Boswell was cramped, bleeding, and in pain, and she asked Riecken to get her a doctor. Riecken refused and told Boswell that she would not be released until she posted bail.
 
 
 6
 Boswell's pain and bleeding became worse. When she went to the bathroom, she realized she had passed some blood clots and saved them to prove to Riecken that she needed immediate medical attention. As her cramps intensified, she pounded on the cell door for help. When Riecken responded, Boswell showed her the clots and a bloody sanitary pad. She again requested medical help. Riecken continued to insist that Boswell--whose family was in Onamia, Minnesota, sixty miles from Elk River--post bail before she could be released. Riecken's only concession was to permit Boswell to phone her mother-in-law, Shirley Boyd. Mrs. Boyd assured Boswell that she would try to raise bail, and she told Boswell to have Riecken call her if Riecken did not believe Boswell needed immediate medical attention. When Boswell finished speaking with her mother-in-law, she again asked Riecken for medical assistance; Riecken again refused. Instead, Riecken called Mrs. Boyd, and informed her that Boswell was having some difficulty with her pregnancy. Mrs. Boyd told Riecken that if Boswell was having cramps and passing blood, Boswell needed to get to a hospital immediately, because she had a history of fast deliveries. Mrs. Boyd added that even if she could raise the bail money, it would take her a long time to drive from her home in Onamia to Elk River. Riecken continued to insist that she needed "$150 to let Boswell out."
 
 
 7
 At some point during Boswell's travail, Riecken notified chief jailer Daniels of Boswell's condition. At Daniels' direction, Riecken contacted the two counties with outstanding warrants, Crow Wing County and Becker County, and attempted to persuade them to authorize her release without bail.[2] Becker County refused, and Riecken continued to insist that Boswell would have to post bail before she could be released. Neither Riecken nor Daniels took any action to contact Boswell's doctor or any other trained medical personnel. Instead, they left Boswell, cramped and bleeding, to languish in her jail cell while they waited for someone to take Boswell off their hands.
 
 
 8
 While Boswell's family sought frantically to raise the bail money in Onamia, Boswell's condition worsened. As her cramps became more frequent and intense, she began crying out for help. Riecken took no steps other than to place another call to Mrs. Boyd's home, where she spoke with Mrs. Boyd's husband William and reiterated that bail would have to be posted before Boswell could be released. As Boswell continued to cry for help, Riecken told her to lie down and put her feet up, because nothing else could be done until the Boyds arrived with the bail money.
 
 
 9
 At about ten o'clock that morning, a local Elk River police officer, Thomas Tyler, stopped by the Sherburne County Jail before beginning his shift. Riecken questioned Tyler, an emergency medical technician, about the signs of miscarriage. When Tyler showed surprise at these questions, Riecken mentioned Boswell. Tyler then offered to look at Boswell. As he walked down the corridor toward her cell, he could hear her cries, which were "quite loud." Tyler found Boswell bleeding and in considerable pain. After a brief examination, Tyler instructed Riecken to call an ambulance. As Boswell was being transferred by ambulance to the hospital, she began giving birth. Her baby, Joseph Boswell, was born at the hospital, where he died thirty-four minutes later.
 
 
 10
 Boswell filed this 42 U.S.C. Sec. 1983 action against Sherburne County and the appellants in their individual and official capacities, alleging, among other claims, that appellants' deliberate indifference to Boswell's serious medical needs violated her eighth and fourteenth amendment rights. After some discovery, appellants moved for summary judgment, and submitted a supporting memorandum which raised the defense of qualified immunity. The district court denied appellants' motion for summary judgment.
 
 
 11
 On appeal, appellants maintain that their obligation to provide medical treatment to a pregnant pretrial detainee was not clearly established at the time this incident took place, and that they are therefore entitled to be immunized against the constitutional claims that Boswell raises in this action.
 
 
 12
 III. DISCUSSION.
 
 
 13
 We start with first principles. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), established that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738.
 
 
 14
 The Harlow Court refashioned the qualified immunity doctrine by rejecting any inquiry into an official's state of mind in favor of a wholly objective standard. Id. Consequently, in determining whether an official may prevail on his qualified immunity defense, we confine our consideration solely to the purely legal question whether "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions * * *." Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).
 
 
 15
 This purely legal question is somewhat complicated in this case because Boswell was a pretrial detainee, not a convicted prisoner. Pretrial detainees have not received a formal adjudication of the charges against them and as such are beyond the power of the state to punish. See Bell v. Wolfish, 441 U.S. 520, 523, 99 S.Ct. 1861, 1865, 60 L.Ed.2d 447 (1979). They are therefore accorded the due process protections of the fourteenth amendment, protections "at least as great" as those the eighth amendment affords a convicted prisoner. City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). While it is well-settled that convicted prisoners find protection in the eighth amendment against prison officials' "deliberate indifference" to their "serious medical needs," Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), it is an open question[3] whether the fourteenth amendment provides pretrial detainees with a greater degree of protection against denial of medical care than the Estelle "deliberate indifference" standard. Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986).
 
 
 16
 We think it both unnecessary and unwise to rush into an area where the Supreme Court has, as yet, declined to tread--unnecessary because a decision whether the fourteenth amendment provides greater protection for pretrial detainees than the eighth amendment "deliberate indifference" standard is not essential to our resolution of this case; and unwise because this question has provoked various responses from the courts of appeals.[4] Even if we apply the eighth amendment "deliberate indifference" standard of Estelle, we are convinced that Boswell has stated her claims against each of the appellants with enough particularity to defeat summary judgment on their qualified immunity claims.
 
 
 17
 This court has in the past taken a broad view of what constitutes "clearly established law" for the purposes of a qualified immunity inquiry, requiring some but not precise factual correspondence with precedents and demanding that officials apply general, well-developed legal principles. Lappe v. Loeffelholz, 815 F.2d 1173, 1177 (8th Cir.1987). While we acknowledge that Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987), requires that the "contours of the [allegedly violated] right * * * be sufficiently clear that a reasonable official would understand that what he is doing violates that right," we are confident that a pretrial detainee's right to emergency medical care was both clearly established and clearly contoured before March 1984, when the incident Boswell complains of took place.
 
 
 18
 Without attempting to canvass the numerous decisions in this area, we select a few examples. As noted above, Estelle v. Gamble, which proscribed prison officials from exhibiting "deliberate indifference to [the] serious medical needs of prisoners," 429 U.S. at 104, 97 S.Ct. at 291, was decided in 1976. The Tenth Circuit in 1980 held that delay in providing medical care which resulted in "continued and unnecessary pain" violated the "deliberate indifference" standard of Estelle. Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Finally, in 1981, we upheld a section 1983 damage award based, in part, on delay of medical treatment to a pregnant woman, which resulted in the stillbirth of her child. Herrera v. Valentine, 653 F.2d 1220 (8th Cir.1981).[5] These are not a few scattered cases providing first evidence of a right that is just evolving, but rather are familiar landmarks on the legal terrain since Estelle was decided in 1976. It is against this background that we evaluate the allegations against each of the appellants.
 
 Jailer Lero
 
 19
 Lero knew Boswell was six and one-half months pregnant and under the care of a physician, whose name and phone number had been provided to Lero. Lero also knew that Boswell had a history of abnormal discharge and had fainted three days earlier, and she learned that Boswell was bleeding and generally was having a difficult pregnancy. Despite this, and despite Lero's knowledge of the significance of bleeding in a pregnant woman, Lero did not contact Boswell's physician or other trained medical personnel, and failed to inform the next shift of Boswell's bleeding. These facts create a jury question as to whether a reasonable jailer in Lero's position would have known that the failure even to inquire of trained medical personnel, or to alert the next shift that Boswell was in danger of having a miscarriage, violated Boswell's clearly established right to medical care.
 
 Jailer Riecken
 
 20
 Boswell's uncontroverted assertions demonstrate that Riecken knew that Boswell was bleeding, cramping and crying, and was starting to go into labor. Boswell repeatedly implored Riecken to summon trained medical personnel, but the facts show Riecken refused to do so until Boswell had already begun to miscarry. We think there is no question but that Boswell has met her burden of alleging sufficient facts to survive Riecken's motion for summary judgment on the ground of qualified immunity.
 
 Chief Jailer Daniels and Sheriff Witschen
 
 21
 Boswell's claims against chief jailer Daniels arise from both his personal involvement in the decision not to obtain medical care for Boswell or to consult trained medical personnel, and his responsibility, along with Sheriff Witschen, for setting jail policy and training and supervising jailers Lero and Riecken.
 
 
 22
 Appellants assert that Daniels had no input into the decisions regarding Boswell's medical care. However, Riecken's log shows that Daniels was consulted as Boswell's condition worsened, and that he directed Riecken to try to secure Boswell's release rather than to summon medical assistance. Immediately thereafter Riecken sent a teletype to the Crow Wing County Jail stating that Boswell "is 6 months pregnant and is starting to bleed. * * * We want her out of our facility as soon as possible." Daniels' directive, the teletype that put it into effect, and Daniels' deposition testimony that he was always consulted about medical problems at the jail and was the final decision-maker in such matters, are enough to create a genuine issue of fact regarding Daniels' alleged "deliberate indifference."
 
 
 23
 With respect to Boswell's supervisory liability claim against Daniels and Witschen, it is well established that government officials may be held liable in damages for the constitutional wrongs engendered by their failure to train or supervise subordinates adequately. See, e.g., Hahn v. McLey, 737 F.2d 771, 773 (8th Cir.1984) (per curiam). This responsibility is not premised on the notion of vicarious liability; rather, it is bottomed on the principle that, in some contexts, failure of an official to safeguard against constitutional transgressions by subordinates constitutes an actionable wrong under 42 U.S.C. Sec. 1983. While the Supreme Court has recognized a cause of action for supervisory liability, it has noted important limitations on its application, requiring an "affirmative link between the occurrence [of the misconduct] and the adoption of any plan or policy by [defendants] * * * showing their authorization or approval of such misconduct." Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). We have recently held that a plaintiff must link the alleged constitutional violations to the supervisors' conduct by showing that the supervisors were "deliberately indifferent" to the constitutional rights of the plaintiff. Wilson v. City of North Little Rock, 801 F.2d 316, 322, and n. 3 (8th Cir.1986).
 
 
 24
 We think that Boswell has succeeded in forging this link, at least for purposes of withstanding Daniels' and Witschen's motion for summary judgment on the issue of qualified immunity. Most prominent among Boswell's allegations is that inadequately trained jailers were directed to use their own judgment about the seriousness of prisoners' medical needs, rather than being directed to consult trained medical personnel. There is also evidence that Daniels and Witschen decreed that medical costs should be minimized by, among other things, releasing prisoners if possible to avoid medical expenses. These allegations, and the substantiating evidence, are sufficient to establish a colorable claim of liability on the part of the supervisors. See, e.g., Miranda v. Munoz, 770 F.2d 255, 260 (1st Cir.1985). Moreover, Boswell has presented more than a modicum of statistical evidence that shows that medical expenditures at the jail have fallen in each of the last three years, statistical evidence which buttresses Boswell's allegations that Daniels and Witschen instituted a policy of denying prisoners at the Sherburne County Jail adequate medical treatment in order to cut costs.
 
 
 25
 Taken together, the evidence presented against appellants states with particularity the circumstances under which each violated Boswell's clearly established right to medical care. As both constitutional and case law make clear, pretrial detainees are entitled to the same due process protection as ordinary citizens. While it remains to be seen whether Boswell can demonstrate each appellant's culpability to the satisfaction of a jury, we hold that Boswell has presented sufficient evidence to withstand a motion for summary judgment.
 
 
 26
 Accordingly, the decision of the district court is affirmed.
 
 
 
 *
 Steven Daniels is referred to as John Doe Daniels in the caption of this case because his identity was unknown to the plaintiff at the time this action commenced
 
 
 [1]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota
 
 
 [2]
 The teletype from Sherburne County Jail to Crow Wing County Jail was as follows:
 We have in custody Wanda Charlene Boswell on DWI. She has a warrant for your co. $50.00 bail. She also has a warrant in Becker Co. She has the bail of $150.00 for this one. She is 6 mo [sic] pregnant and is starting to bleed. What would you like done about your bail [sic] We want her out of our facility as soon as possible. Any suggestions?
 Crow Wing County responded:
 If she has the bail take it--if she doesn't release her from our charges, we'll try for her later. We don't want the medical bills either!!!!!!
 Designated Record on appeal at 34 (emphasis added).
 
 
 [3]
 In two recent cases, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the Supreme Court deemed negligence insufficient to cause a deprivation of due process under the fourteenth amendment, but stopped short of adopting the "reckless or deliberate indifference" standard prescribed by Estelle. See Davidson, 106 S.Ct. at 673 (Blackmun, J., dissenting). We are thus left without an answer whether the fourteenth amendment provides pretrial detainees with protections greater than or equal to those provided to convicted prisoners by virtue of the eighth amendment "deliberate indifference" standard
 
 
 [4]
 The Fourth, Ninth, Tenth and Eleventh Circuits have held that in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care, the minimum standard allowed by the due process clause is the same as that required by the eighth amendment for convicted prisoners. Whisenant v. Yuam, 739 F.2d 160, 163 n. 4 (4th Cir.1984); see also Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir.1985); Hamm v. DeKalb County, 774 F.2d 1567, 1571-72 (11th Cir.1985), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). Other courts have suggested that a different standard is appropriate. In Matzker v. Herr, 748 F.2d 1142, 1147 (7th Cir.1984), the court of appeals said that a pretrial detainee's rights are violated "when a jailer fails to promptly procure competent medical aid for a pretrial detainee who suffers a serious illness or injury while confined." The Fifth Circuit adopted a similar approach in Alberti v. Klevenhagen, 790 F.2d 1220, 1224 (5th Cir.1986). It is a matter of conjecture whether, on a given factual circumstance, there would be a different result if the Matzker test, rather than the deliberate indifference test of Estelle, were used
 
 
 [5]
 Three weeks after the incident at issue in this case, the Second Circuit held that a pregnant inmate who miscarried stated a cognizable claim where she alleged that defendants intentionally delayed emergency medical aid. Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1984). The Archer court had no doubt that delay of medical care to a pregnant inmate violated the "clearly established" standard of Estelle v. Gamble. Id