**Vincent WILLIAMS–EL, Appellant,**

v.

**Darrell JOHNSON, Sam Smith, Claude Woodson, Mrs. Harris, George Kinsey, Rosemary Terranova, and City of St. Louis, Appellees.**

No. 88–1607.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1988.

Decided April 5, 1989.

Rehearing Denied May 1, 1989.

Kevin P. Schnurbusch, St. Louis, Mo., for appellant.

Julian L. Bush, St. Louis, Mo., for appellees.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and BRIGHT, Senior Circuit Judge.

ARNOLD, Circuit Judge.

This appeal arises out of Vincent Williams–El's allegation that a correctional officer beat him while he was a pretrial detainee at the St. Louis Municipal Jail. Claiming his constitutional rights had been violated by the beating and subsequent denial of medical care, Williams–El sued the jailer, Darrell Johnson, his supervisor, Sam Smith, the superintendent of the St. Louis Medium Security Institution, Claude Woodson, a jail nurse, Mrs. Harris, the St. Louis Director of Correctional Services, George Kinsey, the Director of the St. Louis Department of Welfare, Rosemary Terranova, and the City of St. Louis. At the close of the plaintiff's case, the District Court directed a verdict in favor of defendants Woodson, Harris, Kinsey, Terranova, and the City. At the close of all evidence, the Court directed a verdict in favor of the remaining defendants. On appeal, Williams–El contests all these rulings, save the one in favor of Woodson,[1] arguing that he made a submissible case against each of these six defendants. He also challenges various evidentiary rulings of the trial court. We reverse and remand with respect to defendant Johnson, and affirm with respect to the other defendants.

I.

On June 27, 1985, Vincent Williams–El was a resident of the St. Louis Municipal Jail, awaiting sentencing on a murder charge. According to Williams–El, he was waiting for his GED class to start, watching a TV set through a partition at the rear of the classroom, when, without provocation, Darrell Johnson, a jailer, grabbed him by the collar and pulled him to the floor. Williams–El lay there for about 15 seconds, while Johnson cursed him. When Williams–El tried to get up, Johnson punched him in the face four times. Williams–El fell backwards against a radiator and then slid to the floor. Johnson continued to attack Williams–El until he was stopped by other correctional officers. One of the other jailers, an Officer Love, shoved Williams–El into an elevator to separate the two men. Williams–El tripped on a mattress lying in the elevator and again landed on his back.

After the altercation, Williams–El was returned to his cell and placed in lock-down. Williams–El claims that at this time he asked Captain Smith, a supervisor at the jail, to get him medical treatment for his bruised back and split lip. Later, while still in lock-down, Williams–El complained to Nurse Harris of severe back pain and requested treatment. Williams–El claims that jail personnel were aware that he had a bullet lodged near his spine and heart from a shooting accident that occurred when he was a teenager. Yet, despite their knowledge of his preexisting condition and his requests for aid, jail officials never furnished Williams–El with any kind of medical treatment.

This account of the facts is the foundation of Williams–El's § 1983 action, in which he alleges his constitutional rights were violated when Johnson punched him and when he failed to receive medical attention for his injuries. Williams–El contends that this occurred because Johnson, a recently hired correctional officer, was not qualified for the position and had received inadequate training in the correct use of force.[2] The City requires that its correc-

---

1. During the trial it became evident that Woodson had no authority over the St. Louis Municipal Jail. Apparently this is why Williams–El does not appeal the directed verdict in Woodson's favor.

2. The jail's Chief of Security, Major Booker, conceded that if Williams–El's account of events is credited, Johnson used excessive force in subduing the prisoner.

tional officers possess high school diplomas or the equivalent. Johnson had not finished high school, nor did he have a strong employment record since dropping out of school. Guards were supposed to undergo a two-week training course in which they were taught the proper use of force and how to handle stressful situations. However, Johnson, a less than exemplary employee,[3] had not attended the course, though he had worked as a jailer for three months. Such a long period of employment without receiving academy training was unusual. Tr. II at 35. Despite Johnson's lack of qualifications and training, however, he was the only guard responsible for a GED class of about twenty prisoners and a ward for mentally retarded inmates. Williams–El contends that these facts and circumstances give rise to liability on the part of Johnson, the City, and various supervisory personnel at the jail.

The defendants contest Williams–El's account of events in the GED room. Johnson filed an incident report which stated that at "[a]pproximately 4:50 p.m., [I] observed resident Vincent Williams in an unauthorized area while he was supposed to be in GED class. After instructing Resident Williams to move from the door[ ] he refused and opened the door[;] standing next to him[,] I reached around and closed the door. Resident Williams then straight arm pushed me ... in the chest ... clenching his opposite hand in a fist. I then struck him about the face[,] knocking him down. Resident Williams fell to the floor ..." Plaintiff's Ex. 2. A use-of-force report, a part of the incident report, was filed by Lt. Galloway and stated that "resident was instructed three times to take his seat and to stop disrupting class." Plaintiff's Ex. 4. When "the resident rushed with both hands closed and swinging wildly," then Johnson responded with "closed right hand." *Id.* In short, the defendants contend that Williams–El provoked and threatened Johnson, who had to punch Williams–El in the face to subdue him. Captain Smith testified that punching a prisoner in the face

numerous times could be an acceptable use of force "if that's what it took." Tr. I at 74.

The defendants also offered a different version of the facts with respect to Williams–El's medical treatment. They claimed that Williams–El did not complain that his back had been injured, did not have a split lip, and did not request medical treatment. Indeed, when asked if he wanted medical attention, Williams–El declined it.

The defendants elaborate on Johnson's resume and training as well. They point out that Johnson was working toward his GED while a jailer, and intended to acquire it during his probationary period. The defendants note that Johnson had taken a job as a security guard before coming to work at the jail. The defendants admit Johnson had not attended the academy for training, but explain that the two-week class was taught only when there were enough new guards to make holding the session worth while. In any case, Johnson was not without training and guidance: he had received on-the-job training, with an experienced officer accompanying him every time he worked a new floor. The defendants also contend that Johnson had received some instruction on the correct use of force, through either on-the-job training or the training manual.

These were the versions of events presented to the jury. At the close of plaintiff's case, the District Court granted a directed verdict in favor of defendants Woodson, Harris, Kinsey, Terranova, and the City. The Court explained that Williams–El had not shown that Woodson, Kinsey, Terranova, or the City were responsible for the hiring of unqualified guards. Tr. II at 92–93, 96. Nor had Williams–El proved that he had suffered a serious injury to which Nurse Harris was indifferent. *Id.* at 96. At the close of the defendants' case, the Court granted a directed verdict for Johnson and Smith, explaining that it simply did not believe

---

**3.** Johnson had received three ratings of "proficient" and thirteen of "meets standards" on his evaluation. "Meets standards" was the minimum rating an officer could receive and retain his position. If such an officer did not improve in six months to a year, he would be dismissed.

Williams–El's account of events. *Id.* at 136–40. This appeal followed.

## II.

Williams–El contends that the District Court erred in directing a verdict in favor of Johnson, arguing that under a correct application of directed-verdict law, he made a submissible case under § 1983. We agree.

A trial court must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, "[i]f reasonable minds could differ as to the importance of the evidence, ... a verdict should not be directed." *Id.* at 250–51, 106 S.Ct. at 2511. When faced with a motion for a directed verdict, the trial court should view the evidence in the light most favorable to the nonmoving party, and give the nonmoving party the benefit of all favorable inferences reasonably to be drawn from the evidence. *Lang v. Cone,* 542 F.2d 751, 754 (8th Cir. 1976). Unless the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion, the motion for directed verdict should be denied. *Decker–Ruhl Ford Sales v. Ford Motor Credit,* 523 F.2d 833, 836 (8th Cir.1975).

After reciting the *Anderson v. Liberty Lobby* standard for granting a directed verdict, the District Court held that "no reasonable jury would return a verdict in favor of this plaintiff." Tr. II at 136. The Court went on to explain in detail why it believed Williams–El's account of events was incredible. By making this explicit credibility judgment, the Court misapplied the standard for directing a verdict and invaded the province of the jury. Substantially different versions of the facts were presented in this case. The only fact agreed upon was that Johnson punched Williams–El in the face. How many punches were thrown under what provocation, and whether the punching was an excessive use of force were all hotly disputed. These questions should have gone to the jury and been answered by the jury.

Apparently recognizing that the Court's decision cannot be upheld under its stated rationale, the defendants seek to preserve the ruling by offering an alternative reason for the result. The defendants contend that because Williams–El could bring a state tort action that would adequately compensate him for his alleged injuries, he should be limited to that cause of action, and not be allowed to proceed under § 1983. They cite *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

In *Parratt,* the Supreme Court held that a plaintiff's procedural due process claim against prison officials was lacking in merit where there was an adequate state post-deprivation remedy sufficient to compensate him for his injury. Though *Parratt* involved deprivations of property, the doctrine has been extended to deprivations of liberty as well. *Birkenholz v. Sluyter,* 857 F.2d 1214, 1217 (8th Cir.1988); see also *Thomas v. Booker,* 784 F.2d 299, 310–11 (8th Cir.) (en banc) (Bowman, J., dissenting), *cert. denied,* 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986). The defendants argue that because Williams–El could be fully compensated for his liberty deprivation by bringing a state tort action for battery, he should be limited to that remedy under the *Parratt* doctrine.

Before applying *Parratt v. Taylor* to this case, however, we must ask what kind of due process is involved, procedural or substantive. The *Parratt* doctrine has not been applied to questions of substantive due process, *Daniels v. Williams,* 474 U.S. 327, 338, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring); *Wilson v. City of North Little Rock,* 801 F.2d 316, 321 (8th Cir.1986), and the reason is clear. Procedural due process is about when and how the state may deprive a person of property or liberty; it involves the procedures a state must follow before a right is taken away. Substantive due process, on the other hand, proscribes "certain government actions regardless of the fairness of the procedures used to implement them."

*Daniels, supra,* 474 U.S. at 331, 106 S.Ct. at 665. What kind of due process claim does Williams–El make?

■ Williams–El was a pretrial detainee at the time of the incident. Under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979). The defendants argue that the pretrial detainee/prisoner distinction is procedure-based: Williams–El may be punished, but only after receiving the requisite process, *e.g.,* a trial. The defendants go on to argue that due process does not forbid the infliction of corporal punishment, since corporal punishment may even be administered to school children, see *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), if the proper procedures are followed. Indeed, the defendants argue, a convicted murderer would rather have a few punches in the face than a life sentence. Thus, defendants contend Williams–El's claim is properly characterized as a procedural-due-process case.

■ We do not accept the defendants' characterization of the issue. Prison-beating and police-brutality cases have long been brought under the Due Process Clause as violations of substantive, not procedural, due process. These cases involve deprivations of liberty that cannot be legitimized no matter how much process is given. See, *e.g., Burton v. Livingston,* 791 F.2d 97, 100–01 (8th Cir.1986); *King v. Blankenship,* 636 F.2d 70, 72–73 (4th Cir. 1980); *Johnson v. Glick,* 481 F.2d 1028, 1032–33 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Collum v. Butler,* 421 F.2d 1257, 1259 (7th Cir.1970); *Talley v. Stephens,* 247 F.Supp. 683 (E.D.Ark.1965). If we were to hold that these injuries were compensable only under state law, then there could be no more § 1983 actions to reform prison systems.

■ The defendants' final attempt to support Johnson's directed verdict is to argue that the jailer is entitled to qualified immunity. Citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), they argue that unless it was clearly established that it was unconstitutional for a correctional officer to beat a prisoner unnecessarily, Johnson cannot be held liable. This proposition has long been clearly established, and so this argument must fail.

### III.

Having established that the due-process case against defendant Johnson should have gone to the jury, we must now explore whether the same is true of Williams–El's claims against any other defendant. Williams–El contends that Johnson's behavior led to liability on the part of Smith, Kinsey, Terranova, and the City. We examine each of these arguments in turn.

■ Williams–El contends that, as a supervisor at the City jail, Smith was responsible for seeing to it that Johnson had the qualifications to handle the job. He argues that Smith knew Johnson had been working for only three months, lacked the requisite high school diploma, and had not attended the correctional officers' training academy, yet placed Johnson in charge of twenty prisoners attending a GED class and an entire ward of mentally retarded inmates. Williams–El argues that Smith should have known that Johnson lacked the training to handle this potentially explosive situation, and that his actions constituted the deliberate indifference that gives rise to supervisor liability. See *Wilson v. City of North Little Rock,* 801 F.2d at 322.

First, we point out that Smith had no control over the hiring of correctional officers. He had no involvement at all in choosing among the applicants or in setting out the qualifications for the job. Second, Smith was not connected with the operation of the training academy. He was responsible for seeing to it that new jailers received on-the-job training, including training in the use of force, but Williams–El does not claim Smith was remiss in this area. As for the assignment of Johnson to controlling the GED class and mentally retarded ward, while Johnson was not a stel-

lar employee, he was an adequate one, and he had not had trouble handling inmates before. Williams–El did not establish liability on the part of Smith.

■ George Kinsey was the Director of Adult Correctional Services for the City and, as appointing authority for the City, had the ultimate say over who was hired at the municipal jail. There was a requirement at the time Johnson was hired that correctional officers possess a high school diploma or its equivalent, yet Johnson was not a high school graduate. Also, Williams–El claims that Kinsey was directly responsible for the operation of the municipal jail and the work of its employees. Williams–El argues that Kinsey's liability stems from derelictions in these two areas.

Williams–El failed to make a submissible case against Kinsey. While we do not think the Constitution requires that correctional officers possess high school diplomas, we note that, in any case, Johnson was working toward his GED while employed at the jail. Apparently he had promised the City he would attain this certificate degree during his six months' probationary period. Also, evidence at trial showed that an L.T. Brown was the jail's superintendent, not Kinsey. Kinsey, in fact, had no direct responsibility for the city jail.

Williams–El's case against Rosemary Terranova is even more tenuous. Director of the Department of Welfare for the City, she was responsible for appointing Kinsey and for overseeing his performance. Respondeat superior is not an adequate basis for liability, *Monell v. New York Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), and Williams–El does not show any other connection between her and the jail.

■ A "city cannot be held liable under § 1983 unless [plaintiff] prove[s] the existence of an unconstitutional municipal policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Williams–El argues that two policies combined to cause Johnson to punch him and thereby violate the Constitution: (1) the City's policy of hiring inexperienced and undereducated correctional officers, and (2) its policy of giving these employees inadequate training. Certainly it is conceivable that a city's policies on hiring and training jail guards could be so inadequate as to trigger a § 1983 violation. See, *e.g., Hirst v. Gertzen*, 676 F.2d 1252, 1263 (9th Cir.1982). However, Williams–El does not demonstrate that the City of St. Louis had policies that were constitutionally deficient. First, we are not prepared to hold that the Constitution requires that a prison guard possess a high school diploma or that he attend a certain two-week training course. In any case, the stated policy of the City is in fact to hire correctional officers with high school diplomas, and to give them on-the-job and police-academy training. The written, official policy of a city is to be given great weight in determining what the city's policies are. *Cf. Praprotnik, supra*, 108 S.Ct. at 926–27. Williams–El alleges only a single deviation from these written policies: the presence of Johnson at the jail. This single occurrence does not prove the existence of a custom or usage in conflict with the official policy, especially since Johnson's situation is not a clear case of the stated policy's being ignored. Though hired without a high school degree, the City made plain to him that he had to obtain his GED within six months. And Johnson was not without training from the City, since he received on-the-job training. If he had remained at the jail longer, there is no reason to think he would not have attended the academy as well. We do not think Williams–El proved the City had unconstitutional policies.

## IV.

■ Still to be addressed is Williams–El's other claim: that he received constitutionally inadequate medical attention after the incident. This claim is against defendants Smith and Harris.

Williams–El's cause of action fails because he cannot show that a serious medical need was ignored. Even if Williams–El's version of his injuries is given full credence, the most he can show is a split lip

and a minor bruise to the back. Neither is a serious condition. To prove a constitutional violation, an inmate must show that prison officials were deliberately indifferent to his *serious* medical needs. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976) (emphasis added). Williams–El's claim fails with respect to Nurse Harris because he can prove neither a serious medical need nor deliberate indifference. She examined him after the altercation and found nothing wrong with him. Williams–El may disagree with her assessment of his condition, but this does not give rise to liability. *White v. Farrier*, 849 F.2d 322, 327 (8th Cir.1988).

### V.

Plaintiff also complains that certain evidence was wrongly excluded. First, Williams–El argues that he should have been allowed to present evidence of other instances where excessive force was used against prisoners by Johnson. Second, Williams–El contests the District Court's exclusion of three pieces of evidence related to Johnson's qualifications and conduct. Two of the items, Johnson's employment application and new-employee information form, were excluded as needlessly cumulative, since there had already been testimony to the facts contained in these documents. The third item was Johnson's performance notification and letter of resignation. A few days after punching Williams–El, Johnson failed to show up for work. He did not call in with an explanation or excuse. A few days later, he sent a letter of resignation. The District Court kept this evidence out, explaining that it was irrelevant to the question of whether Johnson beat up Williams–El.

We deem it inappropriate to rule on these evidentiary questions at the present time. They may not recur at the new trial, and if they do, the context will be different. Johnson will be the only defendant, so the argument that the evidence might be relevant to show other defendants' knowledge of Johnson's propensities will no longer be apposite. We are content, for the present, to leave these evidentiary matters to the sound discretion of the District Court if they again arise at the new trial.

The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.