**Ellena HARRIS, Appellee,**

v.

**CITY OF PAGEDALE, Appellant,**

**Michael Hayles, Defendant.**

**No. 86–2022.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1987.

Decided June 17, 1987.

Rehearing and Rehearing En Banc Denied July 28, 1987.

Frank Susman, St. Louis, Mo., for appellant.

William Edward Taylor, St. Louis, Mo., for appellee.

Before HEANEY, McMILLIAN and FAGG, Circuit Judges.

McMILLIAN, Circuit Judge.

Ellena Harris brought this action under 42 U.S.C. § 1983 against the City of Pagedale, Missouri (the City), and against Michael Hayles, formerly a City police officer. Officer Hayles falsely arrested Harris and, while she was in police custody, sexually assaulted her. In bringing this action, Harris alleged Officer Hayles violated her civil rights by the assault. She also alleged the City was liable because, before the assault, municipal officials in positions of final authority had been deliberately indifferent to many citizen complaints of physical and sexual misconduct by Hayles and other police officers. The jury returned a verdict against both Officer Hayles and the City and awarded Harris $200,000 in damages. The District Court[1] for the Eastern District of Missouri entered final judgment on the verdict. The City now appeals.[2]

For reversal, the City contends (1) the evidence did not establish the existence of a City custom or policy, a requisite for municipal liability under § 1983; (2) members of the Board of Aldermen or the Chief of Police did not have the final policymaking authority to establish the City custom or policy alleged; and (3) this City custom or policy did not proximately cause Officer Hayles to sexually assault Harris. For the reasons discussed below, we affirm the judgment of the district court.

I.

Sometime after midnight on January 29, 1985, Officer Michael Hayles stopped Harris's car on a city street. Officer Hayles was in uniform and driving a patrol car.

1. By consent of the parties, this case was tried to a magistrate, the Honorable David D. Noce, United States Magistrate for the Eastern District of Missouri, pursuant to 28 U.S.C. § 636(c)(3).

2. Hayles appeared *pro se* at the trial and does not appeal the verdict. Before the trial, Hayles had pled guilty in state court to a criminal charge of sodomy for the sexual assault on Harris and was sentenced to five years probation.

Officer Hayles told Harris he had pulled her over because she had run a red light, which Harris denied. Officer Hayles handcuffed Harris, put her in his patrol car and drove her to the City police station. At the station, Officer Hayles took Harris to an office, where he sexually fondled her and told her to "cooperate with him" if she wanted to go home and not get into any trouble. Harris said Officer Hayles told her he had stopped "lots of women" like this before and, if they did what he asked, he let them go.

Officer Hayles then took Harris out of the police station, put her in his patrol car and drove to a cemetery across the street. Harris said Officer Hayles told her, "I always come over here when I can't go to a hotel." In the cemetery, Officer Hayles repeatedly raped and sodomized Harris.

Before taking her back to her car, Harris said Officer Hayles warned her that he would make trouble if she told anybody what had happened. He specifically threatened to have her put in jail and to have her children taken away from her. On two occasions after the assault, Officer Hayles went to Harris's house and attempted to talk to her.

## II.

The central issue in this appeal is whether the City, as well as Officer Hayles, is liable for Harris's sexual assault under 42 U.S.C. § 1983. Harris alleged the City was liable because there was a municipal custom of failing to receive, investigate and act on citizen complaints of physical and sexual misconduct by City police officers. To establish that this municipal custom existed, Harris presented evidence of prior incidents of police sexual misconduct, including prior incidents involving Officer Hayles, and evidence that various City officials in positions of authority and responsibility had received notice of these incidents. Because the City challenges the sufficiency of the evidence to establish the municipal

custom alleged, we will set out in detail the evidence in this case.

Harris testified that Officer Hayles admitted that he had falsely arrested and sexually assaulted other women. Her testimony was corroborated by extensive evidence of prior incidents of sexual misconduct involving Officer Hayles.

**1983 Incident**

Several witnesses testified about Officer Hayles' alleged sexual assault of a young woman in the summer of 1983 ("the 1983 incident"). The young woman claimed Officer Hayles had arrested her, taken her to a small, dark room at the police station, thrown a coat over her head, and sexually fondled her. City police officer Arthurine (Tina) Jones testified that she was in the police station on the night the young woman was arrested. Jones said she was at the dispatcher's desk in the front of the station when she heard a woman crying and went down the hall to investigate. Jones walked into an office and found Officer Hayles and the young woman in the room with the lights off. Jones said the young woman was crying hysterically. City police lieutenant Allean Helms was also on duty at the station that night. She testified for the City that she did not see or hear anything unusual.

The young woman involved in the 1983 incident did not testify at the trial. Her allegations were testified to by Frederick Searcy, a family friend.[3] Searcy said he was contacted by the young woman's mother following the incident and had accompanied the mother and daughter to a meeting about the incident with then City Chief of Police Odis Williams. Searcy testified that at this meeting Chief Williams acknowledged that he had received other citizen complaints of sexual misconduct by Officer Hayles. The young woman lodged a formal complaint against Officer Hayles, and Chief Williams promised to conduct an investigation. On June 21, 1983, the police chief wrote to the young woman's mother;

---

**3.** As to this, and all other hearsay reports of past complaints of police misconduct admitted into evidence, the district court repeatedly instructed the jury to consider the testimony only as proof that the City had received notice of such prior complaints and not as proof of the validity of the complaints.

the letter was introduced into evidence at the trial. Chief Williams stated in the letter that he had interviewed Officer Hayles and other officers on duty at the police station on the night of the young woman's arrest. Williams said he was suspending Officer Hayles for two days for "questioning a female prisoner in an isolated area in the police department without the presence of a female officer." [4]

The young woman also filed a complaint against Officer Hayles with the St. Louis County Police Department. Detective Alysia Johns investigated the charge. Detective Johns testified that she notified Chief Williams of the charge against Officer Hayles in the course of the investigation. The investigation was eventually dropped, Johns said, because the victim refused to cooperate.

The young woman and her family also made complaints to City Mayor Mary Hall and to Louise Hall, a member of the Board of Aldermen, the City's governing body. (Mayor Hall and Alderwoman Hall are not related.) At trial, both City officials acknowledged that they had spoken personally with the young woman about the incident and said that they had believed her allegations against Officer Hayles.

Alderwoman Hall and Mayor Hall called a meeting of the Board of Aldermen to discuss the 1983 incident. At the meeting, the Board unanimously voted to refer the matter to the St. Louis County Police Department for investigation. The investigation resulted in a finding that the complaint was unfounded. The Board received this finding in October 1983 and decided to briefly suspend Officer Hayles for interviewing a female suspect without a female officer present in violation of police department policy.

**Northwoods Videotape Incident**

Lieutenant Greenbaylum Walker of the Northwoods, Missouri, Police Department testified about another incident of sexual misconduct involving Officer Hayles. Lieutenant Walker said that in August or September 1983, during the course of an investigation, he had videotaped an interview with a female suspect who lived in the City. A few days after this interview, Lieutenant Walker telephoned Mayor Hall at City Hall and said:

I have viewed a videotape of a person that was in the custody of our department that had statements on it concerning a member of [Mayor Hall's] police department that I felt she should be apprised of that could probably cause problems later if something wasn't done.

Lieutenant Walker told Mayor Hall that the police officer involved was Officer Hayles. At Lieutenant Walker's invitation, Mayor Hall and Alderwoman Hall went to the Northwoods Police Department to see the videotape. Lieutenant Walker said he told the mayor then that he thought the videotape could cause trouble in the future. He explained at trial that he meant to warn Mayor Hall "either the person was not telling the truth and will continue to spread the rumor and that would be a problem I could foresee, or the person was telling the truth and there could be a possibility of someone being assaulted."

Alderwoman Hall described the videotape interview at trial. The suspect said that Officer Hayles had stopped or arrested her many times in the City, had always "made deals" with her, had threatened to charge her if she refused to do as he told her, usually took her to the cemetery or to a hotel, and several times had tied her up and taken nude photographs of her.[5] Alderwoman Hall testified that she believed

---

**4.** It is unclear from the record whether this suspension was in fact ever ordered.

**5.** Certain details of the videotape allegations were corroborated by other evidence. Officer Hayles apparently kept sexually explicit magazines and other sexual paraphernalia in his desk and briefcase at the police station. Officer Tina Jones was ordered to clear out Officer Hayles's desk in the back office of the police station

following the Harris assault. Jones testified that she found what she described as pornographic bondage magazines in Officer Hayles's desk. Alderman John Taylor testified that he was in the company of police supervisors on an occasion when Officer Hayles's briefcase was opened. Taylor reported that the briefcase contained pornographic bondage magazines and lengths of rope.

the suspect's story and that she had concluded by the time she saw the videotape that Officer Hayles was "a sexual freak."

Mayor Hall gave a similar account of the videotape interview and testified that she, too, believed the woman's story. Mayor Hall said she informed the Board of Aldermen and the City Attorney about the suspect's allegations against Officer Hayles. Alderwoman Hall denied the mayor had ever informed the Board of Aldermen about the videotape. The videotape was played for the jury at the trial.

### January 1985 Incident

There was testimony about another incident of sexual misconduct involving Officer Hayles. A female City resident testified that in January 1985, Officer Hayles stopped her car and found a small amount of marijuana in her purse. Officer Hayles handcuffed the woman, put her in his squad car and drove her to the police station. He took her to a small room and kissed and sexually fondled her. The woman testified Officer Hayles offered to let her go in exchange for sex and that she consented because she feared for her life. Officer Hayles arranged to meet the woman later that night in front of her apartment building. Officer Hayles came to her apartment building that night, but the woman said she did not go outside to meet him. The following night, Officer Hayles caught the woman outside her apartment building and insisted that she meet him later. Again she did not meet Hayles and testified that he telephoned her several times after that. She did not report the incident to any City official.[6]

### Other Incidents

Mayor Hall testified that she had personally received complaints from three other female City residents of further incidents of sexual misconduct involving Officer Hayles. The women were identified by name at trial. The first complainant told the mayor that Officer Hayles had arrested her, locked her up, tied her feet and sexually approached her. Mayor Hall said she communicated this complaint to Alderman Taylor, the City Attorney and the Board of Aldermen. The second complainant said that Officer Hayles had locked her in a cell at the police station and then watched her through the closed circuit television camera, which made her afraid to go to the bathroom. Mayor Hall said she reported this incident to the Board of Aldermen. A third woman complained to the mayor that Officer Hayles had arrested her and tied her up with rope. Mayor Hall said she reported this incident to Alderwoman Hall and the City Attorney.

A portion of Officer Hayles's deposition was read to the jury at the trial. Officer Hayles said in deposition that in January 1985, he was approached on the street by a City police department official, who informed him that a complaint had been filed against him by a female City resident. The woman alleged that Officer Hayles had come to her home and tried to force her to allow him to date her teenaged daughter.

Mayor Hall testified that she had also received prior complaints of sexual misconduct against former Chief of Police Williams. Two women, identified by name at trial, had complained that Chief Williams had forced them to commit oral sex in his squad car. In November 1982, the mayor wrote a letter to the Board of Aldermen. The letter was admitted into evidence at the trial. The letter informed the Board that complaints of sexual misconduct had been made against Officer Hayles, Chief Williams, and another City police officer, Ricky Collins. The mayor asked the Board to discipline all three officers. Alderwoman Leatrice Dowd testified that the Board had received this letter, but acknowledged that they took no action in response.

Several City officials testified about personally receiving many other complaints of sexual misconduct by City police officers that they recalled in less detail. Alderwoman Hall testified that she "knew of" a complaint against Officer Collins connecting him with a statutory rape. Alderman

---

6. The district court instructed the jury to consider evidence of unreported incidents of police misconduct only as evidence that such prior incidents had occurred and not as evidence that the City had had notice of such prior misconduct.

Taylor testified that he had received a newspaper article in the mail from an unknown source alleging that Collins had raped a fifteen-year old girl. Taylor said he talked about the complaint with Chief Williams and with Alderwoman Hall. Alderwoman Dowd testified that she, too, had received a complaint of sexual misconduct involving Officer Collins and also several complaints that he had used excessive physical force. Alderwoman Dowd also indicated that she had received several reports from citizens that City police officers were seen taking women into the cemetery located across the street from the police station. Alderman Taylor testified that during his two-year term in office (April 1983 to April 1985), he had received between 15 and 20 anonymous complaints of sexual misconduct by City police officers. Taylor said it was his practice to refer all complaints of police misconduct to Chief Williams, even when callers told him the alleged misconduct involved Chief Williams.

Assistant United States Attorney David Rosen testified that he had received numerous complaints about civil rights violations by City police officers. He wrote a letter to Chief Williams dated August 23, 1982, that was introduced into evidence at the trial. In the letter, Rosen cites the increasing number of civil rights complaints.

### III.

■ A municipality is liable under § 1983 for unconstitutional acts by its officials or employees that implement or execute a municipal custom or policy, but may not be held vicariously liable for unconstitutional acts by employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (*Pembaur*); *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (*Monell*). The City asserts that Harris's claim against it is based solely on the vicarious liability theory of *respondeat superior*.

■ Harris denies that her claim against the City is based on a theory of vicarious liability. She argues instead that the City is directly responsible for her injury because municipal officials were deliberately indifferent over the years to a known pattern of unconstitutional actions by City police officers. She alleges there existed in the City a municipal custom [7] of failing to receive, investigate or act on citizen complaints of physical and sexual misconduct by police officers.

■ This court has held that where a § 1983 claim is based on a municipality's alleged failure to prevent misconduct by its employees, the city is liable only where municipal officials can be shown to be directly responsible for the improper actions of their subordinates. *Wilson v. City of North Little Rock*, 801 F.2d 316, 322 (8th Cir.1986) (*Wilson*). The claimant must demonstrate "deliberate indifference or tacit authorization [by municipal officials] of the offensive acts by [failure] to take remedial steps following notice of a pattern of such acts by ... subordinates." *Id.* Thus, to prove her case, Harris had to show that City officials had notice of prior incidents of police misconduct and had deliberately failed to act on this knowledge.

The City argues that the evidence of past incidents of sexual misconduct by Officer Hayles and other police officers was either uncorroborated or hearsay or both. Hence, although Harris introduced copious evidence of past misconduct, the City argues the evidence was not reliable. Even if such prior incidents actually happened, the City denies that City officials had notice of most of these actions. In those instances where City officials acknowledged receiving citizen complaints of such incidents, the City denies that Harris demonstrated any pattern of deliberate indifference in their handling of these complaints. The City concedes that City officials may not have diligently pursued citizen complaints, but ar-

7. A municipal custom is a practice of municipal officials that is not authorized by written law, but which is "so permanent and well-settled ... as to [have] the force of law." *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), *citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970).

gues that this inaction demonstrates, at worst, mere negligence and not deliberate indifference to a known pattern of unconstitutional police conduct, citing *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence does not give rise to a § 1983 claim based on due process violation).

Harris refutes the City's claim that there was no reliable evidence of repeated prior incidents of sexual misconduct by Officer Hayles and other police officers. She and another alleged victim testified at trial that they were sexually assaulted by Officer Hayles. In addition, City officials and City residents testified that similar accusations had been made against Officer Hayles and other police officers by many other victims. Harris also challenges the City's assertion that municipal officials had no notice of these prior incidents. Several City officials acknowledged many times at trial that they were aware of past incidents of sexual misconduct by City police officers, that they had received many citizen complaints of such incidents and that they had, on occasion, notified other members of City government about citizen complaints. Harris points out that despite such notice, City officials did not investigate or respond to citizen complaints of sexual misconduct by police officers in any meaningful way. According to Harris, City officials were more than just negligent because they persistently failed to remedy a known and continuing pattern of unconstitutional police misconduct.

In *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981) (*Herrera*),[8] this court affirmed the liability of the City of Gordon, Nebraska, under § 1983 for injuries to JoAnn Yellow Bird, an Indian woman who was severely beaten by a Gordon police officer. Yellow Bird alleged there existed a pattern of police brutality against Indians that was well known to municipal officials.

She presented evidence of many prior citizen complaints to the City of Gordon and to state agencies about police mistreatment of Indians, and also the report of an outside investigation criticizing the City of Gordon's operation of its police department. *Id.* at 1225. Finding persuasive the evidence that the City of Gordon knew of a serious problem of racially-motivated police brutality, we held the municipality's failure to address or correct the known problem amounted to "deliberate indifference to … violations of a citizen's constitutional rights" sufficient to sustain municipal liability under § 1983 for Yellow Bird's beating. *Id.* at 1224–25.

The amount and specificity of proof of direct municipal involvement offered in *Herrera* contrasts with that offered by the § 1983 claimant in *Wilson,* 801 F.2d 316. In *Wilson,* the plaintiff sought to hold the Chief of Police of the City of North Little Rock liable for a police roadblock set up one evening outside a local skating rink, allegedly for the purpose of harassing black customers. The theory of liability was that the police chief had failed to prevent an unconstitutional police action by his subordinates. There was no evidence that the Chief of Police knew of the roadblock until the day after it was completed. Nonetheless, as evidence that the police chief had tacitly authorized the roadblock, the plaintiff argued in general terms that the police chief had supervisory authority over his subordinates and offered vague testimony by another police officer that "there was very little done … that he didn't direct." *Id.* at 323. We held this evidence insufficient to show that the Chief of Police had tacitly authorized the roadblock. *Id.*

■ We are satisfied that Harris has proved the existence of the municipal custom she has alleged and we uphold the jury verdict in her favor. When we review a challenge to the sufficiency of the evidence

---

**8.** That portion of our decision in *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981) (*Herrera*), permitting damages awards based on the abstract value of constitutional rights was disapproved in *Memphis Community School Dist. v.*

*Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2541 n. 5, 2543–45, 91 L.Ed.2d 249 (1986). In all other respects, however, *Herrera* remains good law in this circuit.

supporting a jury verdict, we consider all the evidence in the light most favorable to the verdict. *Herrera,* 653 F.2d at 1224 n. 2. Considered in this light, the evidence in this case clearly establishes that there was a pattern of sexual misconduct by City police officers, especially Officer Hayles, that on repeated occasions City officials in positions of authority and responsibility were notified of the offensive acts, but that upon receiving such notice, these City officials repeatedly failed to take any remedial action. We conclude this amounts to deliberate indifference to police abuses. Thus, we hold that Harris has proved the existence of a municipal custom sufficient to support municipal liability under § 1983.

## IV.

The City next contends that the evidence does not support the jury's findings that members of the Board of Aldermen and the Chief of Police had the final policymaking authority to establish the municipal custom alleged. The City also contends that the jury was erroneously instructed that the actions of a single member of the Board of Aldermen could establish a municipal custom.[9]

■ Not every action by a municipal official will subject a city to liability under § 1983. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur,* 106 S.Ct. at 1299 (plurality opinion) (footnote omitted); *see Williams v. Butler,* 802 F.2d 296, 299 (8th Cir.1986) (banc).

■ Several members of the Board of Aldermen and the City Attorney testified at trial about the scope of policymaking authority of City officials in the areas of police discipline and response to citizen complaints of police misconduct.[10] It was apparently the usual practice of individual members of the Board of Aldermen to re-

fer citizen complaints of police misconduct to the Chief of Police for investigation. The Chief of Police had the general supervisory authority to discipline police officers. The Board of Aldermen, however, retained the final authority to discipline or to fire a police officer. Thus, while the Chief of Police could suspend or discipline an officer for a brief period of time on his own authority, the sanction did not become official until the Board had approved it.

In practice, the Board of Aldermen's approval or disapproval of police discipline worked like an appeal procedure. The disciplined officer could protest the police chief's initial decision by bringing the matter before the Board of Aldermen. If the officer was satisfied with the discipline or lack of discipline imposed, and the Board of Aldermen did not take the matter up of its own accord, the Chief of Police's decision simply ended the matter. Alderman Taylor recalled 10 or 15 occasions when Chief Williams suspended officers on his own authority and the matter did not come before the Board of Aldermen.

The City argues first that no individual member of the Board of Aldermen has the authority to establish a municipal custom because, under state law, the Board exists and can act only as a collective body. Rev. Stat.Mo. § 79.110 *et seq.* Based on this premise, the City claims that only the actions of the Board of Aldermen as a whole can establish City custom or policy. The City stresses that when the Board of Aldermen as a collective body was notified of the 1983 incident, they responded immediately and ordered an independent investigation.

Harris challenges the City's premise that only the actions of the Board of Aldermen as a collective body are relevant. This is a case alleging a municipal custom, she contends. By definition, custom is unofficial, that is, a course of conduct that has not been approved through formal policymaking channels. Thus, Harris argues, statu-

---

**9.** The jury found that a municipal custom had been established in this case by "the collective or individual actions or inactions of the Board of Aldermen." Special Interrogatory 3C.

**10.** The evidence presented at trial about the scope of the policymaking authority of the mayor is not relevant to this appeal. The jury found that the mayor's conduct did not, in this case, establish a municipal custom. Harris does not appeal this finding.

tory requirements for formal action by the Board of Aldermen as a deliberative and legislative body are not relevant.

The only relevant issue, Harris continues, is whether individual members of the Board of Aldermen had the power to make informal City policy through their conduct. Members of the Board of Aldermen testified that they had the authority to receive citizen complaints of police misconduct and to bring complaints to the attention of the Board of Aldermen as a whole. From this evidence, Harris argues that the jury could reasonably have concluded that individual members of the Board of Aldermen had final policymaking authority in the area of police discipline and response to citizen complaints of police misconduct.

The City also contends the evidence does not support the jury finding that the Chief of Police had the final policymaking authority to establish the municipal custom alleged. The City argues that while the police chief could initially impose discipline on a police officer, he did not have the *final* authority to hire, fire, suspend, or discipline police officers, citing *Pembaur*, 106 S.Ct. at 1300 n. 12 (plurality opinion) (a policymaking official's discretion in the exercise of particular function does not, without more, support municipal liability where the official cannot also be shown to be responsible for establishing *final* government policy respecting such activity).

Harris points out that the Chief of Police alone was responsible for disciplining police officers short of suspension or firing. She also argues that because the police chief had the duty to investigate charges against officers, he could, and the evidence shows he did, fail to investigate or choose to exonerate officers at his discretion. Because police discipline matters generally came before the Board of Aldermen only if the officer involved appealed the sanction imposed, where an officer was not investigated or was cleared of a charge, the Chief of Police's decision was final.

We conclude the evidence supports the jury finding that the Board of Aldermen, as a whole, or its members, individually, as well as the Chief of Police, had the final

authority at issue in this case—the authority to exonerate police officers of disciplinary charges or not to bring any disciplinary action against them at all. We hold, therefore, that these City officials had the final policymaking authority to establish a municipal custom of deliberate indifference to a known pattern of unconstitutional police misconduct.

### V.

The City finally contends that even if City officials in a position of authority and responsibility had established a municipal custom of ignoring reports of sexual misconduct by City police officers, Harris failed to demonstrate that this municipal practice proximately caused her sexual assault. Municipal liability under § 1983 cannot be premised on the mere fact that the unconstitutional act resulted from a municipal custom in a "but for" sense; it must be shown that the act was taken "pursuant to" the custom, *i.e.*, that the municipal custom was "the moving force of the constitutional violation." *Pembaur*, 106 S.Ct. at 1299–1300 n. 11 (plurality opinion) (citation omitted); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. The City argues that Harris failed to show that any citizen complaint of police misconduct was not properly dealt with by City officials and has thus failed to show how City inaction caused her sexual assault.

Harris responds that she documented numerous occasions where City officials failed to properly investigate or act on citizen complaints of police misconduct. There was evidence that individual members of the Board of Aldermen who received citizen complaints routinely referred complaints to the Chief of Police and did not follow up on the complaints. This was routine procedure even though the police chief was himself implicated by several complainants in the pattern of sexual misconduct. In only one instance (the 1983 incident), did City officials call for an independent investigation into a citizen charge of police sexual misconduct. On most other occasions, the Board did not respond at all.

■ We held in *Herrera* that a municipality's continuing failure to remedy a known pattern of police brutality against Indians in the community caused the subsequent beating of an Indian woman by a police officer. 653 F.2d at 1225. *See also Baker v. McCoy*, 739 F.2d 381, 384–85 (8th Cir.1984) (claimant must show pattern of prior similar incidents). Where it becomes clear that a police force needs close and continuing supervision because of a known pattern of misconduct, and the municipality fails to provide such supervision, "the inevitable result" is a continuation of the misconduct. *Herrera*, 653 F.2d at 1225. There can be no question that the Harris assault was similar to many other sexual violations committed by Officer Hayles and by other City police officers. We thus conclude that the City's long-standing evasion of a problem of persistent sexual misconduct by police officers proximately caused the subsequent sexual assault of Harris by a City police officer. The Harris assault was an unconstitutional act taken pursuant to the City custom of deliberate indifference to such acts by its police officers.

In summary, we hold the evidence supports the jury verdict that: (1) there existed in the City a municipal custom of failing to receive, investigate and act upon complaints of physical and sexual misconduct by police officers, (2) the Board of Aldermen, its individual members, and the Chief of Police had the final policymaking authority to establish the municipal custom alleged in this case, and (3) this municipal custom proximately caused Harris's assault by a City police officer. Accordingly, the judgment of the district court is affirmed.