# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2079

_____

Sylvia Perkins, as a Personal Representative of the Estate of Bobby Moore, III, deceased

*Plaintiff - Appellant*

v.

Joshua Hastings, in his individual and official capacities; Stuart Thomas, in his individual and official capacities; Little Rock, City of, a municipality

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 12, 2018
Filed: February 7, 2019

_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Little Rock, Arkansas, Police Officer Joshua Hastings shot and killed fifteen-year-old Bobby Moore III, on August 12, 2012. Moore's mother, Sylvia Perkins, acting as a personal representative of his estate, filed suit against Officer Hastings, Police Chief Stuart Thomas, and the City of Little Rock, alleging claims under 42

U.S.C. § 1983 and state law. The district court[1] granted summary judgment in favor of Thomas and the City, and the case against Hastings proceeded to trial. A jury found that Hastings had violated Moore's Fourth Amendment right to be free from excessive force and returned a verdict in favor of Perkins. After final judgment was entered, Perkins appealed, challenging the summary judgment order. We affirm.

## I. Background

Hastings applied for a position with the Little Rock Police Department in May 2006. Before being hired, Hastings submitted to a polygraph examination, during which he admitted that he had attended a Ku Klux Klan meeting when he was a junior in high school. In a statement, Hastings explained that he snuck into the meeting with two friends to "see what [his friend's] grandpa does."

A hiring committee approved Hastings for hire by a vote of three-to-one. The committee was composed of Chief Thomas, a white male who had served twenty-nine years with the Little Rock Police Department, and three other high-ranking officers, all of whom had served more than twenty years on the police force. The lieutenant who cast the negative vote stated that Hastings's attendance at a Ku Klux Klan meeting disqualified him from serving with the Little Rock Police Department. In a memo to his captain, the lieutenant wrote that he had "serious reservations regarding [Hastings's] judgment and maturity" and that Hastings was "an unfavorable candidate and a potential liability for the Little Rock Police Department."

Hastings was hired in March 2007 and attended twenty weeks of police training. After graduation, Hastings underwent twelve weeks of field training, during

---

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

which he rode along with more experienced officers. Hastings thereafter received forty hours of training per year, including refresher courses on the use of force.

Hastings was the subject of multiple disciplinary actions over the course of his five-year career with the Little Rock Police Department. He repeatedly failed to activate his motor vehicle recording device; failed to properly store property or properly complete paperwork; failed to properly investigate; failed to honor subpoenas; failed to notify supervisors; and failed to follow orders or left his district without permission. Hastings also used inappropriate language or engaged in unbecoming conduct; engaged in improper driving or damaged department equipment; slept on duty; and was untruthful. Hastings's discipline for these violations ranged from counseling and reprimands to suspensions from one to fifteen days.

The Little Rock Police Department maintains an Early Intervention System (EIS) that monitors officers to identify patterns of misconduct. Supervisors have access to the system, and the office of professional standards receives an alert whenever an officer meets "an established threshold [of incidents] . . . pertaining to use of force, on-duty motor vehicle accidents, police pursuits and complaints involving misconduct and inadequate service." Until the software was upgraded in 2012, the system did not distinguish between officers who had used force during an incident and those officers who had not used force but were otherwise involved.

Hastings triggered three EIS alerts during his career. In April 2009, the EIS system identified Hastings as having been involved in six use-of-force incidents during the preceding year. The department had previously investigated the incidents and exonerated Hastings of any wrongdoing. According to the facts gathered by the internal affairs division and set forth in the EIS report, three incidents involved suspects attempting to punch Hastings, to which Hastings responded with a "brachial stun," a punch, and "several straight punches," respectively. The remaining incidents

involved force related to taking down noncompliant or fleeing suspects. Hastings's immediate supervisor reviewed the EIS report and concluded that Hastings had employed "the minimum use of force necessary to carry out his assigned duties as a patrolman." The sergeant determined that the report was a "false alarm" and recommended no disciplinary action. Two lieutenants, a captain, and Chief Thomas all concurred in the sergeant's recommendation.

The next EIS alert occurred in February 2010, after Hastings was involved in ten use-of-force incidents in the preceding year. The department previously had investigated those incidents and exonerated Hastings of any wrongdoing. According to the EIS report, Hastings used force when confronted with suspects who were noncompliant, fleeing, resisting arrest, or attempting to punch or kick the officers. Hastings used force similar to that which was reported in the April 2009 EIS report, including takedowns and punches. He also used a "straight arm bar," a "shoulder pin maneuver," "straight arm strikes," and baton strikes.

After reviewing the file, his sergeant wrote that Hastings's use-of-force incidents were "not that high," in light of his "patrol area consist[ing] of the highest violent crime area and . . . the heaviest call-load." She did not recommend discipline but indicated that she would monitor Hastings's performance. The lieutenant agreed, and the captain advised that he had asked Hastings's supervisors to work with Hastings "very close[ly] to ensure he is professional and works to avoid uses of force." The assistant chief of police recommended additional monitoring and supervision, however, in light of the number of incidents involving the use of force and vehicle pursuits, as well as an on-duty motor vehicle accident and other disciplinary issues. Based on the assistant chief's recommendations, Chief Thomas ordered Hastings to have bi-weekly counseling sessions and required bi-weekly progress reports for six months.

While the investigation into the second EIS alert was pending, Cedric McSwain filed a citizen complaint against Hastings. McSwain reported that he was standing in an alley on March 15, 2010, when he saw officers approaching. McSwain reported that he offered his identification, put his arms in the air, and told the officers his name and address. According to McSwain, officers grabbed him by the arms and legs, threw him to the ground, put a foot on his back, and punched him in the eye. The police report indicated that McSwain was intoxicated, belligerent, and resisted arrest. The report further indicated that because the officers believed McSwain to be a suspect who had fled on foot, they took him to the ground. According to the officers involved in the incident, Hastings held McSwain's left arm during the takedown and thereafter handcuffed him. Hastings did not submit any documentation about the incident or his use of force.

Following an internal affairs investigation, Chief Thomas found that Hastings had violated the department's general orders requiring police-incident reports and use-of-force reports. Hastings was exonerated from the allegations that he had used excessive force and failed to properly operate his motor vehicle recording device. An allegation of untruthfulness was deemed "not sustained." Chief Thomas ordered counseling and remedial training on documenting the use of force. McSwain later filed a lawsuit against Hastings, Chief Thomas, and other officers. The lawsuit was dismissed after McSwain failed to respond to the merits of the defendants' motion for summary judgment. See McSwain v. Hastings, No. 4:13-cv-122-DPM, 2015 WL 731286 (E.D. Ark. Feb. 17, 2015).

Hastings triggered a third EIS alert in April 2010 after being involved in six use-of-force incidents between January 24, 2010, and April 18, 2010. The department investigated those incidents and exonerated Hastings. Like the previous reports, this report indicated that Hastings had used force against individuals who were noncompliant, fleeing, actively resisting arrest, or attempting to punch or kick officers. Hastings's use of force included takedowns, the use of pepper spray, and the

use of "his bodyweight to maintain control" of a suspect. Hastings was ordered to continue with his bi-weekly counseling.

Hastings did not trigger any further EIS reports during his time on the police force, nor were any further citizen complaints or lawsuits filed against him. According to his concise officer history report, Hastings was involved in a total of forty-one incidents involving the use of force. His only use of deadly force during his five-year career occurred when he shot Moore.

Chief Thomas authorized an investigation on June 27, 2012, into allegations that Hastings had been untruthful and was guilty of dereliction of duty. According to the internal affairs report, Hastings had been dispatched to a store at 4:13 a.m. on June 25, 2012, after an alarm company called and reported glass breakage. The alarm company called again at 4:37 a.m. to report an alarm indicating that the front door was opened, at which time Hastings reported to dispatch that he had shaken the front door. Hastings's incident report stated that the offense was a false alarm and that all doors and windows were locked and secured.

The incident was recorded on the store's security camera and directly contradicted Hastings's version of the incident. The recording showed a rock being thrown through a window in the front door. A suspect had entered the business and later exited with a large white bag containing the loot. A police car then drove by without stopping, and the store manager later can be seen entering and exiting the store, presumably while waiting for the officers. The manager called dispatch at 4:46 a.m. to report that no officers had responded to the calls. During an interview, Hastings said that he exited his car, walked up to the doors, and pulled them to make sure that they were secure. According to the investigation report, the video evidence "clearly display[ed] the front doors of the business and never showed Officer Hastings approach the doors." Chief Thomas determined that Hastings had neglected his duty and been untruthful, in violation of the rules and regulations of the police

department. Hastings remained on duty during the investigation into the store incident.

We turn, then, to the incident that gave rise to the present action. In the early morning hours of August 12, 2012, Hastings responded to a report of suspicious activity near an apartment building. According to the caller, two individuals were walking through the parking lot and looking into vehicles with flashlights. Hastings arrived on the scene and advised over the radio that he had heard glass breaking and had observed three black males. The three suspects soon entered a vehicle, and Moore drove the vehicle forward toward Hastings. When Hastings stepped out in front of the car, Moore either stopped the car or placed it in reverse. Hastings fired two rounds into the driver's side compartment, killing Moore. Homicide detectives and members of the Crime Scene Search Unit were called to the scene, and the Little Rock Police Department began its criminal investigation.

Several hours after the shooting and in the presence of his attorney, Hastings was advised of his <u>Miranda</u> rights and interviewed by law enforcement officials. Hastings stated that he was positioned near the top of a hill when he observed two black males in a vehicle and one black male standing nearby holding a flashlight. Hastings repositioned himself and then observed the three suspects enter a different vehicle. Hastings stated that when the vehicle drove forward, he stepped out in front of it, turned on his flashlight, and yelled, "Police, stop the car!" According to Hastings, the driver did not slow down and instead drove "straight at [him]." Hastings stated that he backpedaled and realized that he had no place to go, with rocks behind him and a wall next to him. Hastings claimed that he then shot into the vehicle to prevent the driver from running him over.

Hastings stated that after he fired the two shots, the vehicle passed by him so closely, he could have touched it. According to Hastings, the vehicle "crashed into the rocks" as it proceeded forward, traveled just over an embankment, stopped

momentarily, and then rolled backwards until its rear end struck a parked car. The two passengers fled from the scene. Hastings maintained that he did not shoot at the vehicle while it was traveling in reverse.

Police officers located the two teenage boys who had been with Moore that August morning. One of the boys explained that as the vehicle approached the dumpster, he saw a light and told Moore to stop, which he did. The teenager recounted that Moore put the gear in reverse and started backing down the hill. The officer then opened fire. The other boy said that they were unaware that a police officer was present until the officer stepped in front of the car. He said that Moore was stopping the car when the officer fired shots, whereupon the vehicle traveled backwards.

Hastings's version of the incident was inconsistent with the passengers' accounts and the evidence gathered at the crime scene. The rocky embankment that Hastings claimed the vehicle traveled over was undisturbed. The vehicle's undercarriage was not damaged, and its gear shift was in neutral. A reconstruction of the event determined that the victim's vehicle was traveling "in reverse under power" before it hit the parked car. Chief Thomas ultimately concluded that the vehicle had stopped several feet from Hastings and that the driver was in the process of reversing when Hastings discharged his weapon.

In September 2012, a state district judge issued a warrant for Hastings's arrest on a charge of manslaughter in violation of Arkansas Code § 5-10-104. The supporting affidavit stated that "[w]hile it appears that the vehicle was driving toward Hastings at some point, all of the physical evidence is consistent with statements made by the occupants of the car, indicating that the car was stopped, or in reverse at the time Hastings fired, and not traveling toward him at a high rate of speed, as Hastings indicated in his statement."

Following the internal affairs investigation, Chief Thomas terminated Hastings for violating the general orders and the rules and regulations of the Little Rock Police Department. The termination was based on Hastings's shooting of Moore and his dereliction of duty and untruthfulness regarding the store break-in. With respect to the shooting, Hastings had violated General Order 303, Section II.D., which states, "Officers may only use Deadly Force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious injury." Hastings had also violated General Order 303, Section II.E.1-2, which provides:

> Discharging firearms at a moving or fleeing vehicle is prohibited, unless it is necessary to prevent imminent death or serious physical injury to the officer or another person.

> Officers will not voluntarily place themselves in a position in front of an oncoming vehicle where Deadly Force is the probable outcome. When confronted by an oncoming vehicle, officers will move out of its path, if possible, rather than fire at the vehicle.

Following the criminal and internal investigations, a Deadly Force Review Board was convened to evaluate both investigations. The Board determined that the incident was avoidable and that Hastings "did not adhere to his training when he exited his position of cover and concealment and placed himself in the path of the moving vehicle."

Perkins filed this action against Hastings, Chief Thomas, and the City of Little Rock in June 2015. As relevant to this appeal, she alleged that the City "maintained a widespread custom of excessive force and untruthfulness," that Thomas and the City failed to train or supervise police officers, and that Thomas was individually liable for hiring and retaining Hastings.

In opposition to defendants' motion for summary judgment, Perkins submitted an affidavit and a report by Roger Clark, an expert in police procedures, who opined that the City failed to investigate or discipline its officers. Clark compared the number of incidents of force sustained as excessive (33) to the total number of use-of-force incidents that generated internal affairs reports (577) by Little Rock police officers from 1985 to 2016. Clark found that the percentage of incidents deemed excessive (6 percent) was "inordinately low" and was "a per se indicator of a pattern and practice by the Little Rock Police Department to ignore clear indicators of excessive force by officers." According to Clark, the numbers indicated that the City allowed officers "to repeatedly inflict excessive force and ignore the written policies and procedures of the Little Rock Police Department." Clark did not review the individual incidents involving the use of force and did not identify incidents in which a finding of excessive force should have been sustained but was not. When asked to identify an instance in which excessive deadly force was used between 2004 and 2011, Clark replied, "I did not review the uses of deadly force case by case."

Similarly, Clark did not examine each incident in which Hastings had applied force, concluding instead that Hastings must have used excessive force because he had been involved in forty incidents involving the use of force during his five-year career. Later in his deposition, Clark identified three incidents in which he believed Hastings had used excessive force. When asked which incidents indicated that Hastings would use deadly force against Moore, Clark replied, "[W]hen you have an officer that's non-compliant in any area, it's reflective of being non-compliant in the critical area . . . [, and] sooner or later, their departure from the standard will result in a catastrophic outcome."

As recounted above, the district court granted summary judgment to Thomas and the City. On the claim alleging a municipal custom of permitting or encouraging excessive force, the court determined that Perkins had not established an underlying pattern of excessive force and that "a pattern of untruthfulness, even if proven, is not

-10-

similar enough to be the proximate cause of an officer's use of excessive force." D. Ct. Order of Jan. 27, 2017, at 14. With respect to Perkins's claim alleging failure to train or supervise the City's police officers, the district court concluded that "the undisputed facts do not demonstrate that either Thomas or the city of Little Rock was aware of and deliberately indifferent to a pattern of unconstitutional conduct by the LRPD that was similar to the shooting of Bobby Moore." Id. at 4. The district court also concluded that "the single act of hiring Hastings did not proximately cause a violation of Bobby Moore's constitutional rights." Id. at 15.

Perkins moved for reconsideration, arguing that the court had committed "serious misapplications of the law" and had "arbitrar[il]y pars[ed]" the evidence. D. Ct. Order of Mar. 24, 2017, at 1. Perkins also claimed that the district court had disregarded Clark's expert opinion. The district court denied the motion, reiterating that Perkins had failed to establish a pattern of prior similar misconduct. The court further explained that Clark's statistical analysis alone could not substantiate his opinion that the City maintained a custom of allowing officers to use excessive force.

## II. Discussion

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. Andrews v. Fowler, 98 F.3d 1069, 1074 (8th Cir. 1996). Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Summary judgment is also appropriate when the plaintiff has failed to make a sufficient showing of the existence of an essential element of her case." Andrews, 98 F.3d at 1074.

## A. Municipal Liability

A municipality may be held liable under § 1983 if it, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). Municipal liability exists "only where the municipality *itself* causes the constitutional violation." City of Canton v. Harris, 489 U.S. 378, 385 (1989). A plaintiff thus must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. at 404. The plaintiff also must show a direct causal link between the custom and the deprivation of rights, *i.e.*, that "the municipality was the 'moving force' behind the injury alleged." Id. (quoting Monell, 436 U.S. at 694). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 405.

Perkins first contends that the violation of her son's Fourth Amendment rights was caused by the City's failure to adequately investigate police misconduct. To establish a municipal custom based on a failure to prevent police misconduct, a plaintiff must show that the municipality acted with deliberate indifference to the rights of persons with whom the officers come into contact. See Harris v. City of Pagedale, 821 F.2d 499, 504 (8th Cir. 1987) (applying a deliberate indifference standard to a claim of "a municipal custom of failing to receive, investigate or act on

citizen complaints of physical and sexual misconduct by police officers"). To establish deliberate indifference, a plaintiff ordinarily must show a pattern of constitutional violations.[2] See Brown, 520 U.S. at 409 (explaining that a "pattern of injuries [is] ordinarily necessary to establish municipal culpability and causation"); Parrish v. Luckie, 963 F.2d 201, 204 (8th Cir. 1992) ("To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action."); Harris, 821 F.2d at 504 ("The claimant must demonstrate 'deliberate indifference or tacit authorization [by municipal officials] of the offensive acts by [failure] to take remedial steps following notice of a pattern of such acts by . . . subordinates.'" (alterations in original) (quoting Wilson v. City of N. Little Rock, 801 F.2d 316, 322 (8th Cir. 1986))). The district court determined that Perkins's failure to show a pattern of constitutional violations foreclosed her inadequate-investigation claim.

The district court did not err when it required Perkins to establish a pattern of constitutional violations to prove her claim. See Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) ("Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment."); Rogers v. City of Little Rock, 152 F.3d 790, 798 (8th Cir. 1998) ("In order to subject the city to § 1983 liability Rogers must show that the city had a '"policy or custom" of failing to act upon prior similar complaints of unconstitutional conduct, which caused the

---

[2]Perkins has not argued that this case is one where Hastings's use of excessive force was "the plainly obvious consequence" of the City's alleged failure to investigate police misconduct. See Brown, 520 U.S. at 409.

-13-

constitutional injury at issue.'" (quoting <u>Andrews</u>, 98 F.3d at 1075)).[3]  Nor did the district court misinterpret <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966 (3d Cir. 1996), in which the court held that the plaintiff had presented sufficient evidence to allow a jury to conclude that the municipality permitted or encouraged a pattern of excessive force through its inadequate investigations of civilian complaints.  Although Perkins maintains that the City's investigations into misconduct were "nothing more than a facade, designed to exonerate officers," Appellant's Br. 16, she has not addressed the substance of the district court's decision to grant summary judgment to the City—that she had not presented sufficient evidence to show a pattern of constitutional violations.

At summary judgment, Perkins argued that the evidence established a "pattern of shooting at moving cars that do not pose an objectively reasonable fear of imminent death or great bodily harm."  She presented some evidence regarding six incidents in which officers had used deadly force against individuals driving vehicles.  The district court concluded that only one of the shootings was arguably unjustified and that the remaining incidents involved drivers attempting to run over police officers.  D. Ct. Order of Jan. 27, 2017, at 13.  The court concluded that Perkins thus had not shown a pattern of constitutional violations, even assuming that some officers had "acted imprudently because they could have stayed inside their vehicles, waited

---

[3]Perkins argues that the district court relied on a "non-existent quotation" from <u>Rogers</u>, Appellant's Br. 8, and thus erroneously concluded that "deliberate indifference will not be found if the alleged misconduct was investigated and exonerated or if the officer was disciplined," <u>see</u> D. Ct. Order of Jan. 27, 2017, at 9. The district court corrected this error in its order denying Perkins's motion to reconsider.  <u>See</u> D. Ct. Order of Mar. 24, 2017, at 10-12.  Perkins also criticizes the district court for relying on evidence included in the record but not cited by the parties.  The Federal Rules of Civil Procedure clearly allow the district court to consider the materials in the record.  Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

for backup, or gotten out of the way." Id. at 14. Perkins has not explained whether or how the district court erred in its analysis of those incidents, but rather argues that she has established "that several officers fired at several vehicles despite them not being in the path of said vehicles." Appellant's Br. 48-49; see id. at 22. Even assuming that the evidence can support her assertion, Perkins still has not shown that excessive force was used in those shootings, for constitutionally permissible reasons could exist for an officer to shoot at a moving vehicle even when not in the vehicle's path.

Perkins also argued at summary judgment that certain other police shootings demonstrated a pattern of excessive force. The district court considered evidence of those shootings, but found "Perkins's accounts of these events [to be] largely speculative." D. Ct. Order of Jan. 27, 2017, at 11. On appeal, Perkins cites failures in the investigation of a police shooting that occurred in December 2010. The personal representative of that victim's estate brought suit, and the case settled after the officer was denied qualified immunity. While that lawsuit put the City on notice of a possible constitutional violation, one unjustified shooting does not establish a pattern of constitutional violations, and Perkins has not shown that the district court erred in its analysis of the other shootings it considered.

Perkins contends that her expert established "instances of 'facade' investigations and inadequate supervision" and that the district court's "failure to address—or even to mention—this competent, admissible and unopposed expert evidence is wholly inexplicable, and constitutes error." Appellant's Br. 27. The record reveals, however, that the district court addressed this expert evidence in its order denying reconsideration, concluding that Clark's report and testimony could not establish a pattern because his opinion was based only on his statistical analysis and not on actual incidents involving excessive force by Little Rock police officers. D. Ct. Order of Mar. 24, 2017, at 4-5. We find no error in the court's conclusion that

those statistics alone were insufficient to present a triable issue on Perkins's failure-to-investigate claim.  See Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985) (explaining that evidence that the police department sustained only six to seven percent of all registered complaints "indicate[d] nothing" without identifying what made the prior conduct illegal and without "show[ing] that a similar illegality was involved in [the plaintiff's] case" (internal quotation marks and citation omitted)).

In sum, Perkins claims on appeal that the City maintained a custom of facade investigations based on alleged shortcomings in the City's investigations into officer-involved shootings.  The actionable municipal custom here must be one of deliberate indifference to a pattern of excessive force, however, which Perkins has not established in light of the fact that she has not shown a pattern of underlying constitutional violations.

For the same reason, we uphold the grant of summary judgment on Perkins's claim alleging that the City had failed to train or supervise its police officers.[4]  For the City to be liable under this theory, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons

_____

[4]Perkins also sued Thomas in his official capacity as police chief.  "As we have noted, '[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent.'"  Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (alteration in original) (quoting Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006)).

We note in passing that Perkins alleged in her complaint that "Hastings was trained in the appropriate use of force for police officers" and "was fully aware that an officer may not use deadly force in situations where his life and safety, or those of others, is not in danger."  Compl. ¶ 97.  The City presented evidence that Hastings completed approximately 1,500 hours of training, including police academy, field training, and annual courses on the use of force.

with whom the [untrained employees] come into contact.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (alteration in original) (quoting Canton, 489 U.S. at 388); see Tilson v. Forrest City Police Dep't, 28 F.3d 802, 807 (8th Cir. 1994) ("The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" (quoting Bolin v. Black, 875 F.2d 1343, 1347 (8th Cir. 1989))). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 563 U.S. at 62 (quoting Brown, 520 U.S. at 409); see Ball, 594 F.3d at 1002 (requiring "notice of a pattern of unconstitutional acts committed by subordinates" to establish a failure-to-supervise claim). As set forth above, Perkins has not established a pattern of similar constitutional violations.

## B.  Individual Capacity Claims Against Chief Thomas

We reject Perkins's contention that Chief Thomas should be held individually liable for Moore's death based on his decision to hire Hastings. The Supreme Court has set forth an exacting test for imposing liability based on a hiring decision, requiring a court to "carefully test the link between the policymaker's inadequate decision and the particular injury alleged." Brown, 520 U.S. at 410; see id. at 415 ("Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause."); Morris v. Crawford Cty., 299 F.3d 919, 923 (8th Cir. 2002) ("The prior complaints in an applicant's background must be nearly identical to the type of officer misconduct that caused the constitutional deprivation allegedly suffered by a plaintiff."). Perkins points to evidence that Thomas was friends with Hastings's father, that Hastings attended a Ku Klux Klan meeting in high school, that there were irregularities in Hastings's polygraph examination, and that a lieutenant advised against hiring Hastings. We conclude that the referred-to evidence cannot establish the essential link between Thomas's decision to hire Hastings and his use

-17-

of excessive force against Moore. Stated differently, the evidence presents no genuine issue of material fact that a "plainly obvious consequence of the hiring decision" would be Hastings's unjustified use of deadly force. See Brown, 520 U.S. at 412.

We also reject Perkins's argument that she has presented sufficient evidence to preclude summary judgment on her claim that Thomas failed to adequately train or supervise Hastings. A supervisor may be held liable "if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001) (quoting Andrews, 98 F.3d at 1078). The plaintiff must show that the supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [the plaintiff]." Brewington v. Keener, 902 F.3d 796, 803 (8th Cir. 2018) (internal quotation marks omitted) (quoting Livers v. Schenck, 700 F.3d 340, 355 (8th Cir. 2012)). To prove deliberate indifference, the plaintiff must show that the supervisor "had notice that the training procedures were inadequate and likely to result in a constitutional violation." Livers, 700 F.3d at 356 (quoting Andrews, 98 F.3d at 1078).

Perkins has not presented sufficient evidence to show that Thomas had notice of a pattern of excessive force by Little Rock officers, nor has she shown that he acted with deliberate indifference. Hastings's disciplinary record indicates that he was a lazy and careless police officer, seemingly unable to complete the paperwork requirements or meet the scheduling demands of police work. He also engaged in unbecoming conduct and used inappropriate language. While those violations of the police department's general orders or rules and regulations speak volumes about Hastings's general unfitness for police work, they do not establish a pattern of constitutional violations, nor do they show that Thomas's failure to train or supervise

-18-

Hastings resulted in Moore's death. <u>See</u> <u>Livers</u>, 700 F.3d at 356 ("To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability.").

With respect to Hastings's use of force over the course of his career, Thomas ordered additional supervision and additional training after Hastings triggered three EIS alerts and one citizen complaint in 2009 and 2010. Following those remedial actions, Hastings had no further EIS alerts or citizen complaints relating to the use of force. Although Perkins argues that Thomas should have disciplined Hastings for "body-slam[ming] a mentally-ill, homeless black woman" in July 2010, Appellant's Br. 41, Hastings reported that the woman had struck him and that he was trying to prevent her from striking him again. Other than his use of the word "body slam" to describe the takedown, the record does not support an inference that Hastings's use of force was unconstitutional or that Thomas had notice that the report was false. Finally, relying on statistics, Perkins claims that Hastings used force more frequently against racial minorities, but in the absence of evidence that the force used against racial minorities was excessive or otherwise unjustified, those statistics do not support a supervisory claim against Thomas. Perkins has thus not submitted evidence sufficient to show that Thomas had notice that his training and supervision were inadequate and likely to result in the use of excessive force against Moore.

The judgment is affirmed.

_____